SIERRA CLUB, a California non-profit corporation, Plaintiff-Appellant,

v.

UNITED STATES FOREST SERVICE; Zane Smith, Regional Forester, Defendants-Appellees,

Tule River Indian Tribe; Sierra Forest Products; Sequoia Forest Industries; Louisiana-Pacific Corporation; Western Timber Association, Defendant-Intervenors-Appellees.

No. 87-2749.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted March 9, 1988.

Decided April 5, 1988.

As Amended on Denial of Rehearing June 24, 1988.

Ralph A. Bradley, Bradley & Gordon, P.C., Eugene, Or., for plaintiff-appellant.

Anna S. Almy, Dept. of Justice, Land and Natural Resources Div., Washington, D.C., for defendants-appellees.

Michael E. Haglund, Lindsay, Hart, Neil & Weigler, Portland, Or., for defendant-intervenors-appellees.

Before GOODWIN, NELSON and LEAVY, Circuit Judges.

LEAVY, Circuit Judge:

The Sierra Club brought this action pursuant to Section 102(2)(C) of the National Environmental Policy Act (NEPA), 42 U.S.C. § 4332(2)(C) (1982), challenging the Forest Service's decision not to prepare an environmental impact statement (EIS) for nine timber sales in the Sequoia National Forest (the Forest). The district court denied the Sierra Club's motion for a preliminary injunction to halt logging, which had already begun. However, the evidence demonstrates the Forest Service violated NEPA when it decided not to prepare an EIS for these timber sales. The Sierra Club has made a factual showing of irreparable injury; therefore, the balance of harms favors the issuance of an injunction to protect the environment. *Amoco Prod. Co. v. Village of Gambell, Alaska,*—— U.S. ——, 107 S.Ct. 1396, 1404, 94 L.Ed.2d 542 (1987). We reverse the denial of the preliminary injunction and order the district court to grant this injunction immediately. We remand to the district court to determine if the recently filed final EIS for the Forest meets the requirements of NEPA with respect to the nine timber sales.

## FACTS

This action arose in May of 1987 when the Sierra Club challenged the actual or anticipated awarding of nine timber sale contracts in the Forest: the Lion and Camp sales in the Hot Springs Ranger District, the Eye, Peyrone and Solo sales in the Tule River Ranger District, and the Bow Tie and Cabin sales in the Hume Lake Ranger District. At that time, there was no final EIS for the Forest. The Forest Service prepared environmental assessment (EAs) for eight of the nine sales pursuant to 40 C.F.R. § 1508.9 (1987), concluding that no EIS was necessary for them because logging would not significantly affect the quality of the human environment.[1] The Forest Service categorically excluded the ninth timber sale from the need for either an EIS or an EA, pursuant to 40 C.F.R. §§ 1501.4(a)(2)

---

1. Section 1508.9(a) defines an environmental as-     sessment as: "[A] concise public document for

(1987), 1507.3(b)(2)(ii) (1987), and 1508.4 (1982).

Five of the nine challenged sales contained groves of giant sequoia redwoods, which are renowned worldwide for their size and longevity. The Forest Service required a modified clearcutting method to be used in these groves whereby all vegetation except the giant sequoias is removed. The Forest Service claimed this method would enhance regeneration of the giant sequoia by exposing the bare mineral soil which they need to germinate.

The Sierra Club made two arguments in its motion for a preliminary injunction. First, it argued that NEPA and Ninth Circuit law require the Forest Service to prepare an EIS for the timber sales in question. Second, it argued that the EAs the Forest Service prepared were inadequate to meet NEPA's requirements.

NEPA requires the Forest Service to prepare an EIS for all "major federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C). The Sierra Club argued that logging the sales was a major federal action. It argued there was a possibility of irreparable injury from clearcutting, because the Forest's esthetic and recreational qualities would be altered forever. It also argued it would suffer irreparable procedural injury without the environmental analysis that NEPA requires. Moreover, the Sierra Club maintained that the public interest strongly favored issuing an injunction since the Forest is a major destination for travelers and visitors worldwide because of its famous giant sequoias.

In its opinion denying the injunction, the district court did not discuss NEPA's requirements or whether the Forest Service had met them. It made no findings on the

adequacy of the EAs. Instead, it found the parties simply differed in their opinions on how the Forest should be managed.

## DISCUSSION

### A. Standard of Review

A district court's order regarding preliminary injunctive relief is subject to limited review. The denial of a preliminary injunction will be reversed only where the district court abused its discretion or based its decision on an erroneous legal standard or on clearly erroneous findings of fact. *Sierra Club v. Marsh*, 816 F.2d 1376, 1381–82 (9th Cir.1987). A court should not substitute its judgment for that of the agency as to the environmental consequences of the agency's actions. *Kleppe v. Sierra Club*, 427 U.S. 390, 410 n. 21, 96 S.Ct. 2718, 2730 n. 21, 49 L.Ed.2d 576 (1976). The only role for a court is to insure the agency has taken a "hard look" at environmental consequences. *Id.*

An agency's determination that a particular project does not require the preparation of an EIS is to be upheld unless unreasonable. *Foundation for North Am. Wild Sheep v. U.S. Dep't of Agriculture*, 681 F.2d 1172, 1177 (9th Cir.1982). In judging "reasonableness," "[a] court should not substitute its judgment for that of an agency if the agency's decision was 'fully informed and well-considered.'" *Friends of Endangered Species, Inc. v. Jantzen*, 760 F.2d 976, 986 (9th Cir.1985), (quoting *Vermont Yankee Nuclear Power Corp. v. National Resources Defense Council, Inc.*, 435 U.S. 519, 558, 98 S.Ct. 1197, 1219, 55 L.Ed.2d 460 (1978)).

### B. Why NEPA Requirements Were Not Met

■ Section 102(2)(C) of NEPA requires that all federal agencies include a detailed

---

which a Federal agency is responsible that serves to: (1) Briefly provide sufficient evidence and analysis for determining whether to prepare an environmental impact statement or a finding of no significant impact. (2) Aid an agency's compliance with the Act when no environmental impact statement is necessary. (3) Facilitate preparation of a statement when one is necessary."

Section 1508.9(b) provides that the environmental assessment "[s]hall include brief discussions of the need for the proposal, of alternatives as required by section 102(2)(E), of the environmental impacts of the proposed action and alternatives, and a listing of agencies and persons consulted."

statement of environmental consequences —known as an EIS—"in every recommendation or report on ... major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C); *Kleppe*, 427 U.S. at 394, 96 S.Ct. 2723. The Council on Environmental Quality (CEQ) has promulgated regulations, *see* 40 C.F.R. §§ 1500–17 (1984), which bind federal agencies in implementing this requirement. *Id.* § 1500.3. Under the CEQ regulations an agency generally must prepare an EA to decide whether an EIS must be prepared. *Id.* § 1501.4(a), (b), (c); *Jones v. Gordon*, 792 F.2d 821, 827 (9th Cir.1986).

CEQ regulations outline factors that an agency must consider in determining whether an action "significantly" affects the environment within the meaning of section 102(2)(C). These factors include, *inter alia,* (1) the "degree to which the effects on the quality of the human environment are likely to be highly controversial," 40 C.F.R. § 1508.27(b)(4); (2) the "degree to which the possible effects on the human environment are highly uncertain or involve unique or unknown risks," 40 C.F.R. § 1508.27(b)(5); (3) "[w]hether the action is related to other actions with individually insignificant but cumulatively significant impacts. Significance exists if it is reasonable to anticipate a cumulatively significant impact on the environment. Significance cannot be avoided by ... breaking [the action] down into small component parts," 40 C.F.R. § 1508.27(b)(7); and (4) "[w]hether the action threatens a violation of Federal, State, or local law or requirements imposed for the protection of the environment," 40 C.F.R. § 1508.27(b)(10).

The standard to determine if an action will significantly affect the quality of the human environment is whether "the plaintiff has alleged facts which, if true, show that the proposed project *may* significantly degrade some human environmental factor." *Foundation*, 681 F.2d at 1177–78 (quoting *Columbia Basin Land Protection Ass'n v. Schlesinger*, 643 F.2d 585, 597 (9th Cir.1981). "A determination that significant effects on the human environment will in fact occur is not essential." *Id.* at 1178. "If substantial questions are raised whether a project may have a significant effect upon the human environment, an EIS must be prepared." *Id.* (emphasis omitted).

The record demonstrates the Sierra Club has presented facts which show the nine timber sales may significantly degrade some human environmental factor under each of the four C.F.R.s listed above. The EAs either do not discuss, or do not discuss adequately, these C.F.R.s. Consequently, the Forest Service's decision not to prepare an EIS was unreasonable.

First, the Sierra Club raised an issue as to whether logging in giant sequoia groves is likely to be "highly controversial." 40 C.F.R. § 1508.27(b)(4). "The term 'controversial' refers 'to cases where a substantial dispute exists as to the size, nature, or *effect* of the major Federal action rather than to the existence of opposition to a use.'" *Foundation*, 681 F.2d at 1182 (quoting *Rucker v. Willis*, 484 F.2d 158, 162 (4th Cir.1973)). The Sierra Club introduced affidavits and testimony of conservationists, biologists, and other experts who were highly critical of the EAs and disputed the Forest Service's conclusion that there would be no significant effects from logging because the sequoias could be protected and their regeneration enhanced.[2] This is precisely the type of "controversial" action for which an EIS must be prepared. Otherwise, 40 C.F.R. § 1508.27(b)(4) is rendered a nullity. *Compare Foundation*, 681 F.2d at 1182 (held that critical responses from conservationists, biologists, and other experts to EAs prepared for a unique

---

2. Dr. Philip Rundel, an authority on giant sequoia ecology, stated:

> In dealing with potential logging impacts on groves of *Sequoiadendron giganteum* (giant sequoia), common sense suggests that caution such [sic] err on the side of conservation. These priceless biological resources deserve the utmost in careful assessment of potential ecological disturbance. Given the close interrelationship of fire history and giant sequoia life history, any disturbance which alters natural grove fire cycles has the potential to adversely impact long-term population dynamics of these trees.

resource created a "controversy," requiring the preparation of an EIS).

Second, the Sierra Club presented facts to raise substantial questions regarding "highly uncertain or ... unique or unknown risks," 40 C.F.R. § 1508.27(b)(5), on the effects of logging on regeneration of the giant sequoia. A professional forester characterized the modified clearcutting method used in the giant sequoia groves as "experimental, untested and certainly unproven of long-term success." The Forest Service insists logging is beneficial to giant sequoia regeneration because it creates areas of bare mineral soils and sunlight which are necessary for successful sequoia regeneration. However, Dr. Rundel, a specialist in giant sequoia ecology, warned that studies have shown that clearcutting may cause accelerated rates of nitrification and loss of nitrogen, creating a potential for significant adverse biogeochemical impacts. As a consequence, there can be "profound influences on tree population demography." Consequently, Dr. Rundel stated that careful assessment of potential ecological disturbance to giant sequoias is necessary. Nathaniel Stephenson, a doctoral candidate at Cornell University, observed with respect to sequoia regeneration:

> In the past, the bare mineral soil needed for sequoia reproduction was provided by low-density fires such as the natural lightning fire that burned ... in Muir Grove in Sequoia National Park. I visited Muir Grove this spring and observed thousands of newly emerged sequoia seedlings, so dense in areas that I could not avoid trampling several with each step. Seedling densities of over 150,000 per acre have been observed in otherwise undisturbed sequoia groves following fire. In sharp contrast, only 332 seedlings per acre were found two years after a timber harvest in the Mountain Home Grove, and this number has shrunk to only eight per acre 14 years after the harvest. After walking through [an area harvested in 1986], I observed only a single sequoia seedling. There is a notable lack of reproduction ... perhaps due to soil compaction, soil

drying, or a lower nutrient flush than normally follows a fire. Sequoia seedlings may become established [in this area] in later years, but this is uncertain.

The Sierra Club also claimed that reforestation generally has not always been successful in the Forest and in some instances has been a total failure. This claim adds to the controversial nature of these timber sales.

Third, the Sierra Club contended the cumulative effects of logging in the challenged sales could adversely affect the Forest, requiring an EIS. "Cumulative impact" is:

> [T]he impact on the environment which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions regardless of what agency (Federal or non-Federal) or person undertakes such other actions. Cumulative impacts can result from individually minor but collectively significant actions taking place over a period of time.

42 C.F.R. § 1508.7; *see also Thomas v. Peterson,* 753 F.2d 754, 758 (9th Cir.1985) (a single EIS is required to account for actions which individually have an insignificant environmental impact, but which collectively have a substantial impact).

Witnesses for the Sierra Club testified to potential cumulative adverse impacts on: (1) wildlife, in that removal of vegetation radically alters wildlife habitats; (2) watersheds and soils, in that road construction changes drainages and increases surface erosion, while logging practices contribute to soil erosion and increased sedimentation in streams; (3) recreational and esthetic qualities of the Forest, in that a natural forest is replaced by a "scorched earth policy" from slash burning which reduces recreation opportunities; and (4) fisheries, in that increased sedimentation in streams can eliminate the food supply and adversely affect fish eggs, repeated sedimentation suppresses fish populations, and heightened water temperatures from shade removal adversely affect trout. An expert witness testified that even a single timber sale would have cumulative effects upon a national forest:

[It's] essentially axiomatic in forest management, that an activity such as a timber sale, which involves significant land disturbance, both in the roads—form of roads and silviculture, will have cumulative effects on at least one resource in that national forest, and I am unaware in my experience of any exceptions to that.... [W]hen you are talking about commercial logging and road building you will have cumulative effects, and I can't think of an exception.

The Forest Service contends that none of the nine sales, either individually or collectively, are cumulative within the meaning of NEPA. However, its witness on water resources admitted the EAs do not identify the cumulative effects of past and future harvests on watersheds.

This testimony raises substantial questions as to whether the sales may significantly effect the human environment. *Compare Thomas*, 753 F.2d at 759 (holding that testimony is sufficient to raise substantial questions as to the existence of significant cumulative effects, if it shows that cumulative impacts may be leading to aquatic habitat degradation, undocumented in EAs). Moreover, such testimony leads to speculation on potential cumulative effects. The purpose of an EIS is to obviate the need for such speculation by insuring that available data are gathered and analyzed prior to the implementation of the proposed action. *Foundation*, 681 F.2d at 1179. Although the Forest Service maintains it discusses the past and future cumulative impacts in its draft EIS for the Forest, none of the EAs incorporated these discussions in any way.

Finally, the Sierra Club presented facts which show that harvesting of the nine timber sales may violate California's water quality standards.[3] A fisheries biologist and an employee of the California Department of Fish and Game for over thirty years described increased sedimentation in a stream near the Camp and Peyrone timber sales, which he attributed to the Peyrone clearcut. He believed that turbidity

had increased sufficiently to violate California's water quality standards. The CEQ regulations, 40 C.F.R. § 1508.27(b)(10), require the Forest Service to consider state requirements imposed for environmental protection to determine whether the action will have a significant impact on the human environment. Nowhere do the EAs mention the impact of logging upon California's water quality standards.

Because substantial questions have been raised concerning the potential adverse effects of harvesting these timber sales, an EIS should have been prepared. *Foundation*, 681 F.2d at 1178. The Forest Service's decision not to do so was unreasonable. *Id.* at 1177. It failed to account for factors necessary to determine whether significant impacts would occur. Therefore, its decision was not "fully informed and well-considered." *Endangered Species*, 760 F.2d at 986 (quoting *Vermont Yankee*, 435 U.S. at 558, 98 S.Ct. at 1219).

C. *Whether an Injunction Should Have Been Granted*

In analyzing the Alaska National Interest Lands Conservation Act (94 Stat. 2371, 16 U.S.C. § 3120), not NEPA, the Supreme Court in *Amoco* rejected a presumption of irreparable injury when an agency fails to evaluate thoroughly the environmental impact of a proposed action. *See Save the Yaak Committee v. Block*, 840 F.2d 714 (9th Cir.1988). However, it noted that "[e]nvironmental injury, by its nature, can seldom be adequately remedied by money damages and is often permanent or at least of long duration, i.e., irreparable." *Amoco*, 107 S.Ct. at 1404. Consequently, when environmental injury is "sufficiently likely, the balance of harms will usually favor the issuance of an injunction to protect the environment." *Id.*

Here, if *Amoco* applies, the Sierra Club has made a factual showing not that environmental injury is likely, but that is has occurred. Logging has been completed without the benefit of an environmental impact statement in two of the timber sales, and in

---

**3.** California's water quality standards prohibit an increase in turbidity of more than twenty percent where the background turbidity is fifty Jackson turbidity units or less.

all but two of the others, logging is underway. The balance of harms favors the issuance of an injunction to prevent further irreparable harm to the environment.

We reverse the district court's decision and order it to enter a preliminary injunction immediately halting further logging within the entirety of the nine challenged timber sales, as the Sierra Club requested in its May 8, 1987 motion.[4] Further, we remand for the district court to determine whether the EIS recently filed for the entire Forest meets NEPA's requirements with respect to these specific timber sales.

---

4. It is our understanding that at this time, harvesting in the Cabin and Solo sales has been completed. Appellee's Brief 6. As of December 15, 1987, harvesting in the Peyrone sale is eighty percent complete and in the Camp sale, thirty-nine percent complete. Appellee's Brief 6–7. In each of the Peyrone and Camp sales, two cutting units with giant sequoias remain. Appellee's Brief 6. As of December 15, 1987, harvesting the Lion sale is thirty-three percent complete; in the Church sale, eighty-five percent complete; and in the Eye sale, forty-three percent complete. Appellees' Brief 6–7. The Bow Tie and Snow sales presently are on administrative appeal. *Id.*