## In the

# United States Court of Appeals

## For the Seventh Circuit

No. 01-3316

INDIANA FOREST ALLIANCE, INC.,
HEARTWOOD, INC., SASSAFRAS AUDUBON
SOCIETY, INC., REGIONAL ASSOCIATION OF
CONCERNED ENVIRONMENTALISTS, INC.,
PROTECT OUR WOODS, INC.,

*Plaintiffs-Appellants,*

*v.*

UNITED STATES FOREST SERVICE, AND
KENNETH DAY, FOREST SUPERVISOR, AND
HOOSIER NATIONAL FOREST,

*Defendants-Appellees.*

Appeal from the United States District Court
for the Southern District of Indiana, New Albany Division.
No. 99 C 214—**David F. Hamilton**, *Judge.*

ARGUED FEBRUARY 13, 2002—DECIDED APRIL 8, 2003

Before COFFEY, MANION, and WILLIAMS, *Circuit Judges.*

MANION, *Circuit Judge.* In 1999, the United States Forest Service proposed a comprehensive plan to maintain forest openings in the Hoosier National Forest. Pursuant to the National Environmental Policy Act, the Forest Service prepared an environmental assessment and found that the project would have no significant environmental impact

and therefore would not require a more extensive environmental impact statement. Several groups of conservationists appealed the decision through administrative channels and then filed a claim in district court. On a motion for summary judgment, the district court held that because the Forest Service had not acted arbitrarily or capriciously in concluding that an environmental impact statement was not required, that decision must be upheld. We affirm.

## I. Background

The Hoosier National Forest (or the "Forest") consists of approximately 196,102 acres arranged in a checkerboard of private and federal lands across the state of Indiana. The Forest comprises about 27 percent of the total public land available for recreation and 40 percent of the public land open for hunting in Indiana. The United States Forest Service ("Forest Service") oversees the Forest and, as part of that duty, maintains small openings in wooded areas to provide habitat for plants and animals that benefit from vegetation in early successional stages.[1] These forest openings occur as both natural openings, known as barrens, and artificial openings which are maintained by periodic treatments, such as mowing, cutting, or prescribed burning.

On March 20, 1998, the Forest Service announced a proposal for a more comprehensive approach to forest

---

[1] Early successional forests include tree stands less than ten years old and currently constitute about three percent of the Forest, while late and mid-successional tree stands composed of oaks, mixed hardwoods and pine trees greater than ten years old account for 96 percent of the Forest.

openings maintenance. In a letter known as a "scoping notice," the Forest Service proposed maintaining 972 openings covering 3,341 acres over a five-year period. According to the scoping notice, the purpose of the forest openings maintenance project was to provide early successional habitat for a variety of wildlife species, to add visual variety to the landscape, and to provide for recreational activities such as hunting, berry-picking, and wildlife observation.

In March 1999, the Forest Service sent a pre-decision environmental assessment (EA) of the proposed project to interested parties and provided a 30-day public comment period. The EA addressed three management alternatives: the "proposed action" alternative, a "mowing only" alternative, and a "no action" alternative. The Forest Service received about 90 responses from parties both opposed to, and in favor of, the project. Those opposed to the project, including several noted scientists in the field of ornithology, raised concerns as to the project's effects on neo-tropical migrant bird populations and other animals and plants in the Forest. After reviewing the comments on the draft EA, Kenneth Day, Forest Supervisor for the Hoosier National Forest, issued a Decision Notice and Finding of No Significant Impact (FONSI), which announced the Forest Service's plan to proceed with 947 openings on 3111 acres of the Forest.[2] The FONSI was accompanied by a Final EA, which included a response to comments section.

---

[2] The number of openings was reduced based on the public response and efficiency and access concerns.

Several groups of concerned citizens,[3] including the Indiana Forest Alliance, Inc., filed an administrative appeal and on September 20, 1999, Forest Service hearing officer Steve Kessler recommended the affirmance of the Forest Service's decision to maintain the Forest openings as proposed. Regional Forester Robert T. Jacobs incorporated Officer Kessler's findings in full on each of the appeal issues and adopted his recommendation to affirm the Forest Service's decision on October 1, 1999. The plaintiffs then filed suit in federal court alleging that the Forest Service's decision to implement the forest openings project was unlawful on two grounds.[4] First, the plaintiffs contended that pursuant to the National Environmental Policy Act (NEPA) the Forest Service was required to prepare a full environmental impact statement (EIS) for

---

[3] Fourteen different citizen groups participated in the administrative appeal process but only five plaintiff organizations participated in the subsequent suit in district court and this appeal. They are: (1) the Indiana Forest Alliance, Inc., (2) Heartwood, Inc., (3) Sassafras Audubon Society, Inc., (4) the Regional Association of Concerned Environmentalists, Inc., and (5) Protect our Woods, Inc. (hereinafter "plaintiffs"). The plaintiff organizations all alleged that their members use the Hoosier National Forest for a variety of recreational and scientific purposes.

[4] The plaintiffs' allegations that they use the Forest for hiking, camping, and birding are sufficient to establish standing to bring this suit. *See Rhodes v. Johnson*, 153 F.3d 785, 787 (7th Cir. 1998) (advising that standing to bring a NEPA action should be examined even where, as here, the defendant does not dispute it; plaintiffs whose use and enjoyment of a national forest could be diminished by agency decision had standing to bring suit where alleged procedural violations were connected to alleged harm).

the project, not merely an environmental assessment. Second, the plaintiffs asserted that the Forest Service violated the National Forest Management Act (NFMA) by not collecting population data for management indicator species and by not establishing population objectives for sensitive species. Both parties moved for summary judgment, and the district court first ruled that the Forest Service had not acted arbitrarily or capriciously in finding no significant impact of the openings plan and therefore the agency was not required to prepare an EIS. The district court also determined that the Forest Service did not act arbitrarily or capriciously with respect to its monitoring duties under the NFMA when it decided to implement the forest openings maintenance project. The plaintiffs appeal.

## II. Discussion

On appeal the plaintiffs contend that the district court erred in granting summary judgment to the Forest Service because the record reflects substantial, unresolved scientific controversy regarding the impact of the Forest Service's decision on various bird species and therefore the Service violated NEPA by acting arbitrarily and capriciously in deciding not to prepare an EIS. Additionally, they contend that the Forest Service's decision was arbitrary and capricious in violation of the NFMA because the administrative record contains no site-specific data or other monitoring information regarding the impacts of the Forest openings program on many native wildlife species.

## A. Preparation of an EIS

Under NEPA, federal agencies must include an EIS in every recommendation for "major Federal actions *significantly* affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C) (emphasis added); *City of Evanston v. Regional Transp. Authority*, 825 F. 2d 1121, 1124 (7th Cir. 1987). Conversely, an agency is not required to prepare an EIS where the proposed action will not significantly affect the environment. *See id.* at 1125 (citing cases). The Council on Environmental Quality (CEQ) has promulgated regulations to establish uniform procedures for determining whether, when, and how to prepare an EIS. *See* 42 U.S.C. §§ 4341-4347 (establishing the CEQ); *see also*, 40 C.F.R. §§ 1500-1517. When a proposed action is neither one normally requiring an environmental impact statement nor one categorically excluded from the EIS process,[5] the agency must prepare an environmental assessment (EA).[6] An EA has been described as a "rough-cut, low-budget environmental impact statement designed to show whether a full-fledged environmental impact statement—which is very costly and time-consuming to prepare and has been

---

[5]   The CEQ regulations direct agencies to adopt implementing procedures to determine which actions normally do not have any significant impact on the environment and so need not be the subject of a study or report. These actions are referred to as "categorical exclusions." 40 C.F.R. § 1501.4(a)(2). *See also Rhodes*, 153 F.3d at 788; *Heartwood, Inc. v. United States Forest Service*, 230 F.3d 947, 949-50 (7th Cir. 2000).

[6]   NEPA makes no mention of EAs; however, the CEQ regulations outline the requirements for preparing an EA. 40 C.F.R. § 1500 *et seq.* The Supreme Court has stated that these regulations are entitled to "substantial deference." *Marsh v. Oregon Natural Resources Council*, 490 U.S. 360, 372 (1989).

the kiss of death to many a federal project—is necessary." *Rhodes*, 153 F.3d at 788 (quoting *Cronin v. United Stated Dep't of Agriculture*, 919 F.2d 439, 443 (7th Cir. 1990)). "[T]he purpose of an environmental assessment is to determine whether there is enough likelihood of significant environmental consequences to justify the time and expense of preparing an environmental impact statement." *River Road Alliance v. United States Army Corps of Engineers*, 764 F.2d 445, 449 (7th Cir. 1985). In this case, the Forest Service made a finding of no significant impact at the culmination of the environmental assessment process for the forest openings project, and therefore did not prepare an EIS.

The CEQ regulations require agencies to examine two dispositive considerations in formulating an EA to determine whether the proposed action may have a significant effect on the environment, thereby requiring an EIS: "context and intensity." 40 C.F.R. § 1508.27; 42 U.S.C. § 4332(2)(C); *see also, Sierra Club v. United States Forest Serv.*, 843 F.2d 1190, 1193 (9th Cir. 1988).[7] In this case the plaintiffs argue on appeal that the Forest Service failed to properly consider only one of the ten factors that the CEQ regulations identify as indicia of intensity: "(4) The degree

---

[7] The CEQ defines these factors as:

(a) Context. This means that the significance of an action must be analyzed in several contexts such as society as a whole (human, national), the affected region, the affected interests, and the locality.

. . .

(b) Intensity. This refers to the severity of impact. Responsible officials must bear in mind that more than one agency may make decisions about partial aspects of a major action.

40 C.F.R. § 1508.27.

to which the effects on the quality of the human environment are likely to be highly controversial."[8] The plaintiffs contend that the existence of scientific dispute over the effects of the proposed action on wildlife requires a finding that the action is significant, thereby demanding an EIS.

Hence, we begin our analysis of the plaintiffs' claim by looking at the language of the statute. This circuit has yet to address the appropriate manner in which agencies should address this specific indicia of intensity, and neither NEPA, nor its implementing regulations, defines "highly controversial." The primary rule of statutory interpretation is that words used in statutes must be given their ordinary and plain meaning. *United States v. Wilson*, 159 F.3d 280, 291 (7th Cir. 1998). Webster's defines controversy as "a difference marked especially by the expression of opposing views." Webster's Third New International Dictionary 497 (1981). The term "controversial" is then modified by the term "highly," limiting the controversies worth consideration to only those that create a substantial dispute. Those controversies described by the regulation are further limited to only those that concern the effects of the regulation on the environment, and therefore mere opposition to a

---

[8] The Forest Service argues that since the degree of controversy is but one of ten factors agencies must consider in determining intensity under the regulation, the existence of that factor alone is not enough to require an EIS. *See, e.g., Soc'y Hill Towers Owners' Ass'n v. Rendell*, 210 F.3d 168, 184 (3d Cir. 2000) ("[I]t is important to note that the existence of a controversy is only one of the ten factors listed for determining if an EIS is necessary."). However, because we conclude that the Forest Service's assessment of this factor was not arbitrary or capricious, we need not address the issue of whether any one factor could be determinative of intensity under the CEQ regulations.

proposed action will not create high controversy. *See State of N.C. v. Fed. Aviation Admin.*, 957 F.2d 1125, 1134 (4th Cir. 1992) (noting that if controversy were equated with opposition, the EIS outcome would be governed by a "heckler's veto"). Therefore in order for a proposed action to be highly controversial it must be subject to a substantial dispute concerning the specific environmental effects of the action.

While this is the first instance that we have had an opportunity to address this issue, a substantial body of case law has developed in the Ninth Circuit.[9] The Ninth Circuit has held "highly controversial" in NEPA context does not encompass all public opposition to a proposed action, but instead only applies to a substantial dispute as to the size, nature, or effect of an action. *Wetlands Action Network v. United States Army Corps of Eng'rs*, 222 F.3d 1105, 1122 (9th Cir. 2000). *See also, Blue Mountains Biodiversity Project v. Blackwood*, 161 F.3d 1208, 1212 (9th Cir. 1998) (stating that controversy, in this context, requires "a substantial dispute [about] the size, nature, or effect of the major Federal action rather than the existence of opposition to a use." (citing *Greenpeace Action v. Franklin*, 14 F.3d 1324, 1335 (9th Cir. 1993)); *Sierra Club v. United States Forest Service*, 843 F.2d 1190, 1193 (9th Cir. 1988) (accord); *LaFlamme v. Federal Environmental Regulatory Commission*, 852 F.2d 389, 400-01 (9th Cir. 1988) (accord). Thus, controversy

---

[9] The Forest Service itself does not define highly controversial for its own purposes in the context of preparing an environmental assessment. By comparison the FAA has defined this term. FAA Order 1050.1D ¶ 32(b). The FAA's regulations, read literally, indicate that a project is "highly controversial" if the "action" in question is "opposed on environmental grounds by a Federal, State, or local government agency or by a substantial number of the persons affected." FAA Order 1050.1D, ¶ 17.

does not refer simply to the existence of public opposition to a use. *LaFlamme* at 401; *see also Hanly v. Kleindienst*, 471 F.2d 823, 830 (2d Cir. 1972) ("[t]he suggestion that 'controversial' must be equated with neighborhood opposition has also been rejected by others"). Therefore, in reconciling our interpretation of the statute with the developed case law, this factor considers whether there is a substantial dispute about the size, nature or effect of an action in the relevant community. However, the analysis does not end with that conclusion. *See Sierra Club v. Watkins*, 808 F. Supp. 852, 862 (D.D.C.1991) (holding that a controversy does not exist simply because there are conflicting views among experts). If there is such a dispute, NEPA then places the burden on the agency to come forward with a "well-reasoned explanation" demonstrating why opinions disputing an EA's conclusions "do not suffice to create a public controversy based on potential environmental consequences." *LaFlamme*, 852 F.2d at 401.

In *Sierra Club*, for example, the Forest Service decided to award several timber contracts that allowed harvesting in forests containing groves of giant sequoia redwoods. The Forest Service reached this decision without preparing an EIS. *Sierra Club*, 843 F.2d at 1192. The Sierra Club produced testimony from numerous biologists, conservationists and other experts showing that the EA inadequately addressed these concerns and therefore cast serious doubt on the Forest Service's conclusions. The Ninth Circuit observed that "[t]his is precisely the type of 'controversial' action for which an EIS must be prepared." *Id.* at 1193. *See also, Public Citizen v. Department of Transportation*, 2003 WL 124764 (9th Cir. 2003) (finding that a project was sufficiently controversial when 90% of the comments opposed a DOT project and these comments were not addressed by an EA). The Ninth Circuit followed the same approach

but reached a different conclusion in *Wetlands Action Network*, where the court found that because the EA addressed the concerns and objections raised by conservation groups, there was no significant controversy under NEPA. *See Wetlands Action Network*, 222 F.3d at 1122.

Read together, *Sierra Club* and *Wetlands Action Network* establish a two-step approach to determining whether an agency has acted arbitrarily or capriciously in deciding not to prepare an EIS in the face of scientific controversy. First, plaintiff organizations must demonstrate a substantial dispute concerning the size, nature or effect of the proposed action. If they succeed in doing so, the agency must consider the dispute and address the concerns in its final decision. This two-step approach recognizes that as long as the agency has taken a "hard look" at the relevant issues involved in the preparation of an EIS and satisfactorily explained its subsequent decision, the agency decision should not be set aside.

This standard is appropriate considering that our review of the Forest Service's action under NEPA is governed by the Administrative Procedures Act (APA). *Heartwood Inc. v. United States Forest Service*, 230 F.3d 947, 953 (7th Cir. 2000). Under the APA, courts must set aside agency decisions found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law." 5 U.S.C. § 706(2)(A); *FCC v. National Citizens Committee for Broadcasting*, 436 U.S. 775, 802 (1978). To determine whether an agency action is arbitrary or capricious, we must consider "whether the decision was based on a consideration of the relevant factors and whether there has been clear error of judgment*." Marsh v. Oregon Natural Resources Council*, 490 U.S. 360, 378 (1989) (citations omitted). We must satisfy ourselves that the agency "examine[d] the relevant data and articulate[d] a satisfactory explanation

for its action including a 'rational connection between the facts found and the choice made.' " *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). If an agency considers the proper factors and makes a factual determination on whether the environmental impacts are significant or not, that decision implicates substantial agency expertise and is entitled to deference. *Marsh*, at 376; *see also Greenpeace Action v. Franklin*, 14 F.3d 1324, 1330 (9th Cir. 1992). Pursuant to this deferential standard, reviewing courts should not substitute their judgments for those of an agency as to the environmental consequences of its actions. *Kleppe v. Sierra Club*, 427 U.S. 390, 410, n. 21 (1976). Consequently, the standard of review when examining an agency's decision under NEPA is a narrow one. *See Marsh*, 490 U.S. at 378.

Thus we must ask on this appeal whether the plaintiffs have demonstrated a substantial dispute as to the effects of the forest openings project on the environment and whether the Forest Service's decision to proceed despite this scientific disagreement is arbitrary or capricious.[10] The plaintiffs direct our attention to the comments submitted in response to the Forest Service's request and contained in the administrative record from four acknowledged experts on bird issues: Dr. Donald Whitehead, Donald Winslow, Dr. Jean Graber, and Scott Pruitt (col-

---

[10] The plaintiffs only contend that there is a substantial controversy concerning the impact of the forest openings project on several bird species. They do not cite to any substantial controversy regarding the impact of the openings project on the flora, non-aviary wildlife species, visual variety, hunting, berry-picking or general wildlife observation in the Hoosier National Forest.

lectively referred to as the "Dissenting Scientists").[11] Each of these scientists disputed the Forest Service's conclusion that the maintained openings would benefit various bird species dependent on early successional habitat. More specifically, these experts believed that the project would actually have a negative effect on forest interior bird species, no effect on most open land bird species, and, contrary to the EA, believed that no bird species is dependent on these small artificially maintained openings.

For example, according to Dr. Whitehead, eight of the bird species described by the Forest Service as benefitting from the project have never been "tallied" in the Forest.[12] Thus it would be impossible for the project to benefit these species, as the Forest Service claims. Whitehead also contends that the Forest Service was wrong in its assertion that the scarlet tanager would benefit from maintained openings because, in his opinion, the openings would reduce the scarlet tanager's available breeding habitat and would expose it to increased cowbird parasitism. In Whitehead's view, the Forest Service was so obviously wrong about the scarlet tanager that it "seriously undermines the scientific credibility of the [environmental] assessment." Dr. Graber and Pruitt also dispute the claim that the openings benefit birds that live in early successional habitat. They

---

[11] Dr. Whitehead is a biology professor at Indiana University who has researched songbirds in Indiana. Donald Winslow is a doctoral candidate at Indiana University who researches bird breeding in the Forest. Dr. Graber is an ornithologist retired from the Illinois Natural History Survey. Scott Pruitt is an acting supervisor for the U.S. Fish and Wildlife Service.

[12] These species are the Henslow's sparrow, short-eared owl, Bell's vireo, golden-winged warbler, bobolink, dickcissel, Bachman's Sparrow, and field sparrow.

contend many of the openings are too small to provide an adequate habitat, especially for Henslow's sparrow and similar species that only benefit by large acreages of early successional habitat. Thus these experts disputed the beneficial effects of the project and challenged the Forest Service's conclusions as to open-land dependent bird species. The plaintiffs therefore assert that the forest openings maintenance project is "highly controversial" within the meaning of 40 C.F.R. 1508.27(b)(4) because they "have demonstrated that experts and state and federal agencies disagree about the effects of the forest openings project on the human environment."

We agree that the plaintiffs have presented evidence of a controversy as to the effects of this action. However that does not end our inquiry. Rather, we must now consider whether the administrative record shows that these concerns were addressed by the Forest Service in finding that the project would not significantly affect the environment. We conclude that these concerns were addressed. The administrative record is replete with scientific data addressing the concerns of the Dissenting Scientists. During the comment period, Dr. John Castrale, a non-game biologist from the Indiana Division of Natural Resources (IDNR), Division of Fish and Wildlife, voiced his findings in support of the project. His findings are that 14 bird species would benefit from openings maintenance, "[s]ince very little timber cutting has occurred during the last 20 years, maintenance of forest openings is now the only planned way to maintain a proportion (albeit small) of the forest in early successional habitats." Rex Watters, IDNR Reservoir Wildlife Specialist, commented that in light of the IDNR's maintenance of openings on Monroe Reservoir, "[t]he benefits of maintaining these openings far [outweigh] the expense and effort required." Gary Doxtater, Director of the IDNR Division of Fish and Wildlife, discussed the

benefits of openings maintenance on several bird species, bobcats, rabbits, and small rodents. Mark Banker, Regional Biologist for the Ruffed Grouse Society, stated that "[w]ildlife survey data for Indiana strongly supports the Forest's contention that the management of early successional habitat is critical." Similarly, the Indiana Chapter of the Wildlife Society (a self-described organization of professional biologists dedicated to conservation and research concerning wildlife in Indiana) concluded that the openings maintenance will benefit several bird species. These comments were cited extensively in Appendix E of the EA where the Forest Service responded to the comments and criticisms raised during the comment period. *See* Environmental Assessment, Forest Openings Maintenance Project, June 28, 1999, cmts. G-15, P-2, P-3, P-18, P-41, P-49, P-50 (responding to general comments, and comments about plant and animal effects, and providing additional references where appropriate).

In the direct administrative appeal of the FONSI decision, the Forest Service hearing official noted that while dissenting scientific opinions exist, the project was not highly controversial thereby requiring an EIS.[13] Those courts that have addressed this issue have consistently

---

[13] In the Decision Notice and FONSI the Forest Service states:

> Based on the involvement of resource specialists, both within and outside the Forest Service, I do not expect the effects of these actions on the human environment to be highly controversial (scientifically). Some people will not accept this decision; some people will probably find that their own personal needs and values are not served by the proposed actions . . . . However, I believe we addressed the most significant biological, social and economical issues sufficiently to avoid scientific controversy over the scope and intensity of the project.

held that when an agency's finding of no significant impact is based upon adequate data, the fact "that the record also contains evidence supporting a different scientific opinion does not render the agency's decision arbitrary and capricious." *Wetlands Action Network*, 222 F3d at 1120-21. *See also Greenpeace Action*, 14 F.3d at 1333; *cf. Blue Mountains Biodiversity Project v. Blackwood*, 161 F.3d 1208, 1214 (9th Cir. 1998) (requiring an EIS only when the "EA contains virtually no references to any material in support of or in opposition to its conclusions"); *Foundation for North Am. Wild Sheep v. United States Dep't of Agric.*, 681 F.2d 1172, 1178 (9th Cir. 1982) (finding that an agency's failure to address "certain crucial factors, consideration of which was essential to a truly informed decision whether or not to prepare an EIS," rendered unreasonable its decision that no EIS was necessary). This is because scientific dispute is a part of the everyday existence for agencies involved in environmental projects and thus, as the Supreme Court has noted, when "specialists express conflicting views, an agency must have discretion to rely on the reasonable opinions of its own qualified experts even if, as an original matter, a court might find contrary views more persuasive." *Marsh*, 490 U.S. at 378; *see also Friends of Endangered Species, Inc. v. Jantzen*, 760 F.2d 976, 986 (9th Cir. 1985) ("NEPA does not require that we decide whether [a pre-EIS report] is based on the best scientific methodology available, nor does NEPA require us to resolve disagreements among various scientists as to methodology."). NEPA does not demand scientific unanimity in order to support a FONSI; if it did, "agencies could only act upon achieving a degree of certainty that is ultimately illusory." *Greenpeace Action*, 14 F.3d at 1336. *See also, Fund for Animals v. Babbitt*, 903 F. Supp. 96, 115 (D.D.C. 1995) (noting that "disagreement [among experts] does not render the agency's action arbitrary and capricious").

In this case the dispute involves only a few bird species among the many wildlife species impacted by the project, and the Forest Service has provided alternative scientific data that addresses the controversy. The Forest Service's own assessment that the project is not objectively highly controversial is entitled to deference if it is made after a hard look at the controversy and rationally related to the data. Because the Forest Service properly reached this conclusion, based on a consideration of the appropriate factors, it did not act arbitrarily and capriciously in finding no significant impact of the forest openings project and an EIS was not required under NEPA.

## B. Monitoring Indicator Species Under the NFMA

In addition to challenging the Forest Service's decision not to prepare an EIS, the plaintiffs also contend that the Forest Service has violated the National Forest Management Act (NFMA), 36 C.F.R. §§ 219.19 & 219.26, by not monitoring management indicator and sensitive species adequately.

The NFMA requires that the Forest Service create Land and Resource Management Plans (LRMP) to manage National Forests. 16 U.S.C. §1604 (a). The NFMA further requires that each plan set forth objectives to, among other things, ensure a diversity of plant and animal species and maintain the viability of desired species. 16 U.S.C. §1604(e). The Forest Service has promulgated regulations to carry out this mandate under the NFMA. *See* 36 C.F.R. § 219 (1999). Section 219.19 requires the Forest Service to identify management indicator species (MIS) and monitor their populations: "[p]opulation trends of the management indicator species will be monitored and relationships to habitat changes determined." 36 C.F.R. § 219.19(a)(6)

(1999). Another subsection of Section 219 further mandates that:

> [f]orest planning shall provide for diversity of plant and animal communities and tree species consistent with the overall multiple-use objectives of the planning area. Such diversity shall be considered throughout the planning process. *Inventories* shall include quantitative data making possible the evaluation of diversity in terms of its prior and present condition. For each planning alternative, the interdisciplinary team shall consider how diversity will be affected by various mixes of resource outputs and uses, including proposed management practices.

36 C.F.R. § 219.26 (1999).

Consistent with these requirements, the LRMP for the Hoosier National Forest requires that the Forest Service monitor MIS to determine the effects of the management activities. The LRMP states that "[r]ather comprehensive monitoring of these species will provide data on population trends under a variety of habitat conditions found in the forest." However, in order to achieve this goal the Plan only requires that the Forest Service (1) "identify trends of populations of management indicator species and their relationship to habitat changes"; and (2) "monitor effects of management" on populations of sensitive species. Hoosier National Forest Plan (April 1991), 5-4 to 5-7. The plaintiffs contend that the Forest Service has violated the NFMA, and therefore acted arbitrarily and capriciously, because in the EA for the forest openings decision, the Forest Service has not included any hard data regarding the actual impacts of those openings on management indicator species.

Because the NFMA does not create a private right of action, the plaintiffs' claim under the NFMA must be

analyzed under the APA. *See Sierra Club v. Marita*, 46 F.3d 606, 610 n.3 (7th Cir. 1995); *accord Sierra Club v. Peterson*, 228 F.3d 559, 565 (5th Cir. 2000) (*en banc*). Thus, we consider only whether the decision to proceed with the forest openings maintenance project, the final agency action at issue, was arbitrary or capricious in light of applicable NFMA standards. Under this deferential standard, *see supra* p.11-12, the Forest Service's decision to implement the forest openings maintenance project must be upheld if the record shows that the Forest Service took a hard look at relevant NFMA issues in making its decision. *See Kleppe v. Sierra Club*, 427 U.S. 390, 410 n. 21 (1976).

The administrative record shows that the Forest Service relied on a variety of data types to determine management indicator species population trends and to monitor the effects of agency actions on sensitive species. For example, the Forest Service has gathered this data in coordination with the Indiana Department of Natural Resources, Fish and Wildlife Division, as contemplated by the regulations. *See* 36 C.F.R. § 219.19(a)(6) (1999) ("[t]his [MIS] monitoring will be done in cooperation with State fish and wildlife agencies, to the extent practicable"). The record also contains quantitative population information from the following sources: (1) Indiana Non-game and Endangered Wildlife Program of Indiana Department of Natural Resources Atlas of Breeding Birds Of Indiana; (2) archers' index of fur-bearing animal populations; (3) wild turkey hunter bag; (4) maps of transect survey routes on national forest lands; (4) ruffed grouse survey; (5) woodcock survey; and (6) waterfowl surveys. The Forest Service claims that it did not yet have adequate population data to project population trends for fish, stream invertebrates, and cave invertebrates, but it had conducted surveys that provide a baseline of information about population trends. In addition to this direct population informa-

tion, the Forest Service also tracks habitat in the Forest using a database inventory of forest stand and vegetative type information. The Forest Service claims that tracking habitat in this manner generally allows them to monitor the habitat available for management indicator species.

The plaintiffs allege that the NFMA and its regulations, the Plan for the Hoosier National Forest, and the Forest Service Manual required the Forest Service to inventory all management indicator and sensitive species before making a final decision on the forest openings mainte- nance project. They allege that the Forest Service failed that directive by using data on habitat availability as an approximation of the population of MIS, instead of going into the field and actually counting all of the birds.

However, the plaintiffs' argument fails because none of these regulatory sources imposes such a specific require- ment on the Forest Service. We have previously acknowl- edged that the NFMA grants the Forest Service consider- able discretion: "The drafters of the NFMA diversity reg- ulations themselves recognized that diversity was a com- plex term and declined to adopt any particular means or methodology of providing for diversity." *Sierra Club v. Marita*, 46 F.3d at 620. In *Marita*, we approved the consider- ation of habitat changes as one means of managing a forest to encourage diversity and monitor management indicator species. In *Marita*, the Forest Service was logically proceeding under the assumption that an increase in the diversity of habitats would increase the potential livelihood of diverse kinds of organisms. *Id.* at 616. Pursuant to that plan, the Forest Service surveyed vegetative diversity in the relevant planning areas and then assessed animal diversity primarily on the basis of vegetative diversity. The Forest Service then selected MISs for various habitat types and calculated the minimum viable population necessary

to continue the vitality of the species. *Id.* at 617. We concluded that the Forest Service was entitled to use its own methodology to fulfill its obligations unless it was irrational. *Id.* at 621. In that case we found that the method of tracking habitat was rational and therefore not in violation of the NFMA.

We are not alone in this approach. In *Inland Empire v. United States Forest Service*, 88 F.3d 754, 762-63 (9th Cir. 1996), the Ninth Circuit found that the Forest Service complied with 36 C.F.R. § 219 by analyzing the effects of a proposed timber sale on habitats for sensitive species. *See id.* at 761. The court rejected the plaintiffs' arguments that the Forest Service must assess population viability in terms of actual population size or population trends. *Inland Empire*, 88 F.3d at 761 n.8. The court reached this conclusion because it concluded that monitoring available habitat as a method of monitoring species populations was "eminently reasonable." *Id.*[14]

Admittedly, this conclusion is not universally applied. Several courts have held that § 219.19 does not allow use of habitat as a proxy for hard population data. *Sierra Club v. Martin*, 168 F.3d 1 (11th Cir. 1999). *See also Utah Environmental Congress v. Zieroth*, 190 F. Supp. 2d 1265, 1271-72 (D.Utah 2002) (*accord*); *Forest Guardians v. U.S. Forest Service*, 180 F. Supp. 2d 1273, 1279 (D.N.M.2001) (*accord*). Specifically, in *Sierra Club v. Martin*, 168 F.3d 1 (11th Cir. 1999), the Eleventh Circuit held that the Forest Service violated the

---

[14] The Ninth Circuit has subsequently clarified this issue in *Idaho Sporting Congress, Inc. v. Rittenhouse*, 305 F.3d 957, 971-73 (2002). In *Rittenhouse*, the court held that while the use of habitat availability could be used as a proxy for population data, it was inappropriate when the Forest Service's own scientific evidence invalidated that approach. *Id.* at 972.

NFMA because it did not have adequate population data for sensitive species. In reaching that decision, the Eleventh Circuit disagreed with the Ninth Circuit's conclusion in *Inland Empire* that the Forest Service could use habitat information as a means of complying with NEPA regulations' monitoring requirements. *Id.* at 7 & n.10. Significantly, however, that court based its decision in part on the specific management requirements imposed by the Forest Plan itself. *Id.* at 5 ("While it is true that the regulations make no such demand [regarding population data], the Forest Plan explicitly does so."). In that case, the plan provided that: "[w]hen adequate population inventory information is unavailable, it must be collected when the site has high potential for occupancy by a [proposed, endangered, threatened, or sensitive species of plants and animals]." In addition, the court observed that the Forest Service had "no information at all in terms of many of the [sensitive] species." *Id.* The *Martin* court was concerned that the Forest Service had acknowledged that the proposed timber sales would destroy some sensitive species in the affected habitats yet failed to provide specific data concerning the extent of the population declines. *Id.* at 4.[15]

---

[15] Similarly in *Forest Guardians v. U.S. Forest Service*, 180 F. Supp. 2d 1273 (D. N.M. 2001), the plan unequivocally called for specific population data. In that case the plan required: "For non-game birds, the monitoring methods are 'point-counting,' 'management guilds,' 'single season,' and habitat trends. Game animals are to be monitored using 'State Game and Fish census techniques and resultant data' and habitat trends. The purpose of the 'monitoring of habitat and populations [is] to ensure the species do not fall below minimum viable populations.' *Id.* at 1279 (citations omitted). Also in *Utah Environmental Congress*

(continued...)

In this case we find ourselves in a situation more analogous to the scenarios analyzed in *Marita* and *Inland Empire.* The conclusion reached in those cases, that the Forest Service's methods of monitoring various types of data, including the use of available habitat, were reasonable, is applicable in this case. The use of available habitat is eminently reasonable under the Forest Service's plan because the forest openings project is specifically designed to provide a form of habitat in short supply in the Forest. Unlike *Sierra Club v. Martin*, and other cases that reached the opposite conclusion, the plaintiffs have not identified any language in the Plan for the Hoosier National Forest that specifically requires the Forest Service to inventory the populations of management indicator or sensitive species before taking a site-specific action. Instead, the Plan for the Hoosier National Forest more generally requires that the Forest Service (1) "identify *trends of populations* of management indicator species and their relationship to habitat changes"; and (2) "monitor effects of management" on populations of sensitive species. Plan, 5-4 to 5-7. The Forest Service has rated the "desired precision, reliability" of the monitoring of management indicator and sensitive species as "moderate." *Id.* In the EA and the accompanying Biological Evaluation, the Forest Service adequately satisfied these requirements to the extent they relate to the forest openings maintenance project. For example the EA contained synopses on fifteen different avian MIS, including the Scarlet Tanager, and the relevant population trends of each bird. While it is true that the Forest Service

---

[15] (...continued)
*v. Zieroth*, 190 F. Supp. 2d 1265, 1271-72 (D. Utah 2002), the Forest Plan required that the Forest track Blue Grouse as a management indicator species and the agency had failed to collect any data on the species for ten years.

could have used more recent data in many cases, the methods employed by the Forest Service were not unreasonable considering the purpose of the plan. Therefore, we find that the Forest Service reasonably relied on habitat and survey information about management indicator species to monitor the effects of the forest openings management project on those species. Because this method was reasonable, the Forest Service did not act arbitrarily or capriciously in proceeding with the action.

## II. Conclusion

The Forest Service has complied with NEPA and the NFMA in making its decision to implement the forest openings maintenance project. The administrative record demonstrates that the agency followed required procedures and considered relevant data, and therefore did not act arbitrarily or capriciously in arriving at its conclusion. The district court's grant of summary judgment to the Forest Service is therefore AFFIRMED.

A true Copy:

     Teste:

 

_____
*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*

USCA-02-C-0072—4-8-03