# In the
# United States Court of Appeals
## For the Seventh Circuit

_____

No. 03-2644

HIGHWAY J CITIZENS GROUP,

*Plaintiff-Appellant,*

v.

NORMAN MINETA, in his official capacity as
Secretary, United States Department of
Transportation; FREDERICK WRIGHT, in his
official capacity as Executive Director, Federal
Highway Administration; THOMAS E. CARLSEN,
in his official capacity as Acting Secretary,
Wisconsin Department of Transportation,

*Defendants-Appellees.*

_____

Appeal from the United States District Court
for the Eastern District of Wisconsin.
No. 02 C 662—**Charles N. Clevert, Jr.**, *Judge.*

_____

ARGUED SEPTEMBER 19, 2003—DECIDED NOVEMBER 5, 2003

_____


Before BAUER, RIPPLE and WILLIAMS, *Circuit Judges.*

RIPPLE, *Circuit Judge.* On July 3, 2003, the Highway J
Citizens Group ("Citizens") filed this action pursuant to the

Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701-06; the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4321 et seq.; regulations implementing NEPA; and the Wisconsin Environmental Policy Act ("WEPA"), Wis. Stat. § 1.11 & Wis. Adm. Code ch. TRANS § 400 et seq. The named defendants were Norman Mineta, in his official capacity as Secretary of the United States Department of Transportation ("U.S. DOT"); Frederick Wright, in his official capacity as Executive Director of the Federal Highway Administration ("FHWA"); and Thomas E. Carlsen, in his official capacity as Acting Secretary of the Wisconsin Department of Transportation ("WDOT") (collectively "defendants").[1]

Citizens challenged the Ackerville Bridge/Lovers Lane Project, Project #2748-01-00 ("Ackerville Bridge Project") and the County J/Highway 164 Project, Project #2748-01-01 ("County J/Highway 164 Project"). According to the complaint, a "contamination plume" containing arsenic and trichlorethylene ("TCE") is migrating toward the site of the Ackerville Bridge. Among other things, Citizens asked the district court (1) to enjoin the FHWA and WDOT from proceeding with the Ackerville Bridge Project until the location and extent of the contamination plume was determined, (2) to order the FHWA and WDOT to pump grout around the perimeter of pilings that have been driven into the ground to support the Ackerville Bridge, and (3) to require the FHWA to prepare an Environmental Impact Statement ("EIS") for the Ackerville Bridge Project. On June 12, 2003, the United States District Court for the Eastern District of Wisconsin denied Citizens' motion for a prelimi-

---

[1] The FHWA, the federal agency in this case, worked in consultation with WDOT, the funding applicant, in performing the tasks required by NEPA. *See* 23 C.F.R. § 771.119.

nary injunction and then ruled against Citizens on the merits. On June 13, 2003, the district court denied Citizens' expedited motion for stay pending appeal.

Citizens filed its notice of appeal on June 17, 2003. It then asked this court for an emergency injunction to prevent the opening of the Bridge. This court denied the requested relief, but granted Citizens' motion for an expedited appeal. In this appeal, Citizens seeks (1) a permanent injunction requiring closure of the Ackerville Bridge until grout is pumped around the pilings, (2) an EIS of the Ackerville Bridge Project, and (3) a revised EIS of the County J/Highway 164 Project that encompasses the area of the Ackerville Bridge Project and a permanent injunction prohibiting the County J/Highway 164 Project from proceeding until the revised EIS is completed. For the reasons set forth in this opinion, we must deny Citizens the requested relief and affirm the judgment of the district court.

# I

# BACKGROUND

## A. Facts

There are two projects at issue in this case; both are "major federal action[s]" as defined in 40 C.F.R. § 1508.18. Highway J Citizens Group is an unincorporated association of residents of Waukesha and Washington Counties in Wisconsin who are "committed to preserving the beauty, tranquility, and environment of the area." R.1 at ¶ 1. Specific to this litigation, Citizens also includes persons "who live in the area of the proposed Ackerville bridge and whose water supply is threatened with contamination from arsenic and TCE as a result of the proposed Ackerville bridge project." R.1 at ¶ 1. Thus, Citizens' focus in this case

is Project #2748-01-00, the Ackerville Bridge Project. Project #2748-01-01, the County J/Highway 164 Project, is relevant to this litigation only because Citizens believes that it was improperly segmented from the Ackerville Bridge Project.

### 1.   The Ackerville Bridge Project (Project # 2748-01-00)

There are three purposes for the Ackerville Bridge Project. The "primary purpose" is to address safety considerations flowing from the layout of the roads and the close proximity of the railroads. R.38, Ex.1003, A.R. at 00004. Another purpose is to bring the existing facility into compliance with State Trunk Highway standards, which govern the necessary requirements for a road to support truck traffic. *Id.* at 00013. A "secondary purpose" is to provide for future expansion of the roadways due to increasing traffic in the region. *Id.* at 00004. To affect these purposes, the plan provides

> an overpass structure . . . to be built at the Wisconsin Central Limited and the Wisconsin Southern Railroads in order to remove the existing at-grade crossings. The Sherman Road/Fond du Lac Drive connection would also be located under this structure. An additional overpass would be provided at State Highway 175.

*Id.* at 00012.[2]

The environmental assessment ("EA") for this Project was signed by various state and federal officials between October 29, 1999, and December 12, 1999, and was open for public comment from February 22, 2000, to April 7, 2000. *Id.* at 00004. The EA as originally published did not contain a

---

[2]   A Project map is attached as Exhibit A.

discussion of the former waste disposal facility ("landfill") near the Project that was owned by Waste Management Company of Wisconsin, Inc. This landfill is located about 2,000 feet northwest of Ackerville and is leaking "landfill leachate" which has contaminated the underlying ground-water that flows from the landfill. As the contaminated groundwater flows, the contamination can spread or disperse, and this dispersed contamination is known as "contamination plume."

The effect of this contamination plume on the Ackerville Bridge Project was brought to the attention of the defendants by Jeffrey Gonyo, a member of Citizens, sometime during, and possibly before, February of 2000. R.38, Ex.1013, A.R. at 00838 (Wade e-mail); R.38, Ex.1005, A.R. at 00146-00147 (draft "Fact Sheet/Topics of Interest"). Defendants' initial conclusion was that the contamination plume did not raise significant concerns in relationship to the Ackerville Bridge Project. For example, in a February 21, 2000 document entitled "Fact Sheet/Topics of Interest," defendants stated:

- The Waste Management Landfill-Hazardous Materials. If there is contamination in the shallow groundwater, couldn't the structure pilings create a "channel" to contaminate [sic] the deep groundwater where our drinking water comes from?:

- *Acknowledge that both Wisconsin Department of Natural Resources and WDOT are aware of the concerns relating to the Polk Landfill. You can thank Mr. Gonyo for helping to bring the issue to the forefront.*

- *WDOT will be addressing the contaminant concerns relating to the STH 164 project as part of the Phase 1 hazardous materials assessment. The assessment will evaluate [W]DNR documents about the landfill and assess what impact may be associated with the highway project activities. The WDOT*

*will coordinate with the WDNR as needed. The report will include any recommendations that may be needed to address [hazardous materials] concerns.*

- *The Phase 1 Assessment Report will become a public document available for review.*

- *Though preliminary assessment of available information has led [sic] both [W]DNR and WDOT to think there are not likely to be significant project hazmat concerns related to the Polk Landfill, it would be premature to make definitive statements until the Phase 1 report is completed.*

R.38, Ex.1005, A.R. at 00143-00144 (italics in original). A previous, draft version of that document, dated February 15, 2000, addressed the environmental question posed as follows:

- *This landfill was closed in the 1980's. Since that time, extensive monitoring and remediation has taken place. There has been some concern regarding the ground water contamination spreading in the direction of Lovers Lane Road. However, the project requires limited excavation in the area (footing for substructure units of the bridge) and encounters with ground water is unlikely.*

R.38, Ex.1008, A.R. at 00146. In a March 14, 2000 letter from Ken Wade, Hazardous Materials Engineer for the Environmental Team, Transportation District 2 of WDOT, to EMCS Design Group, Mr. Wade noted:

I've attached copies of the latest landfill data collected by Waste Management. It clearly confirms that the concentration of [TCE] nearest the project area is decreasing and stable. The groundwater monitoring well nearest the project corridor is TW23R, located approximately 400 feet west of CTH J. TCE concentrations in well TW23R have dropped from 3 to 2.2 ug/l,

> well below the WDNR groundwater enforcement standard of 5 ug/l.
>
> The water table for this region is approximately 30 feet below the ground surface. If construction plans for the footings require only 4 to 5 feet of excavation, it is very unlikely that contaminated groundwater will impact the project.
>
> It is also unlikely that project pilings or water detention/infiltration basins will cause an impact on plume movement or concentrations.

R.38, Ex.1009, A.R. at 00728.

At the March 23, 2000 public hearing on the Ackerville Bridge Project, Mr. Gonyo testified in opposition to the Project. Among other things, he identified the landfill as a source of contamination that the Project threatened to aggravate. With the aid of numerous exhibits, he testified that: (1) the Project goals could be accomplished by simpler and less costly means, (2) the Ackerville Bridge Project should not be segmented from the County J/Highway 164 Project, and (3) the landfill contaminants pose great risks in conjunction with the Project.

On April 7, 2000, the "Hazardous Materials Site Investigation Report Phase I Addendum" ("Addendum") was released. R.38, Ex.1015, A.R. at 00709-00714. This Addendum was prepared by the EMCS Design Group, which worked in connection with the WDNR in developing the report. The Addendum is based on a review of the March 30, 1990 report entitled "Two-Year Ground Water Monitoring Report Polk Sanitary Landfill Washington County, Wisconsin." This report discusses the groundwater around the landfill, including its flow, contains maps and discussions of arsenic and TCE, and concludes that the landfill was not the source of downgradient TCE detections or

elevated arsenic levels. R.38, Ex.1000, A.R. at 02774-02814. The 2000 Addendum is also based on a review of the "Phase I and Phase II Hazardous Material reports," R.38, Ex.1014, A.R. at 00873-00908, which "were completed in 1994 for this project based on" the originally conceived limited scope of the Project, which did not include a bridge. R.38, Ex.1015, A.R. at 00710. The "February 23, 1994 Phase I Report" identified groundwater in the area as potentially contaminated and noted that WDNR was continuing to monitor it. It added, "The groundwater depth should be determined within the project limits so that excavation to the groundwater depth during construction can be avoided." R.38, Ex.1014, A.R. at 00876. In the Addendum, the landfill is addressed as follows:

> *Site 7* (previous): Town of Polk/Waste Management (WDNR FID # 267062400) was identified in the original phase I report as an inactive waste disposal site. There is groundwater contamination in this area with [TCE] being one of the contaminants. The closest monitoring well is located approximately 400 feet west of STH 164. TCE concentrations in this well have dropped from 3 to 2.2 ug/l, well below the WDNR groundwater enforcement standard of 5 ug/l. This site is 700 feet west of where the proposed Foxboro extension connects to STH 175 and indicated groundwater depths of 30 feet are well below the excavation limits of the roadway. Therefore, it is very unlikely that the contaminated groundwater will impact this project. It is also unlikely that the pilings for the structure supports or retention basins will cause an impact on plume movements or concentrations.

R.38, Ex.1015, A.R. at 00714.

On April 25, 2000, the last signature was placed on the "Finding of No Significant Impact" ("FONSI") for the Project. The FONSI was premised on the EA for the Project,

which was attached to the FONSI. The final EA/FONSI contains a "Basic Sheet A" which includes the comments from the public on the Project and defendants' responses to the comments. Specifically, Basic Sheet A considers whether the landfill "is a significant impact and therefore warrants preparation of an EIS," but concludes the landfill "will not affect the Department's proposed project." R.38, Ex.1003, A.R. at 00005. It explained:

> There is ground water contamination in the area sur-rounding the landfill with [TCE] being one of the contaminants. This site has been under remediation for several years. The closest monitoring well is located approximately 122 m (400 ft) west of STH 164. TCE concentrations in this well have dropped from 3 to 2.2 ug/l, well below the WDNR groundwater enforcement standard of 6 ug/l. Indicated ground water depths of 9m (30 ft) are well below the excavation limits of the roadway or bridge construction.

> The Department has determined that the potential for encountering and impacting hazardous materials dur-ing construction of this project does not exist. Therefore, there is no purpose or need for preparation of an EIS.

*Id.* The EA/FONSI also responded to Citizens' suggestion that the Ackerville Bridge Project and the County J/Highway 164 Project be joined together as one EIS. After considering the three criteria for segmentation set out in FHWA regulations, *see* 23 C.F.R. § 771.111(f)(1)-(3), it concluded that "the selected alternative has logical termini, independent utility, and does not preclude or exclude future alternatives for other projects. It is therefore appropriate that [the Ackerville Bridge Project] be allowed to stand on its own merit." *Id.* at 00004. The EA/FONSI also considered alternatives, including the alternative proposed by Citizens, but concluded that the best alternative to effectuate all of the

purposes of the Project includes the Ackerville Bridge. *Id.* at 00006, 00013.

On July 7, 2000, Mr. Gonyo sent a letter to Paul Tufts, an environmental specialist at the FHWA, requesting that the defendants reconsider the FONSI and that an EIS be prepared before any construction on the Project. This letter specifically notes as a concern that "the pilings will have to be driven into and below the contaminated groundwater table." R.38, Ex.1017 at 2. According to the defendants, Richard Madrzak of the FHWA requested information from Jay Waldschmidt of the WDOT, Bureau of Environment, to respond to Mr. Gonyo. R.29 at 10. During their oral conversation, Mr. Waldschmidt discussed previous conversations with Chad Czarkowsi and Phil Fauble of WDNR, and then Mr. Madrzak asked to have something in writing. *Id.*

On August 22, 2000, the WDNR provided the WDOT a memorandum, per the request of Mr. Waldschmidt, in response to the groundwater concerns. R.38, Ex.1020, A.R. at 12294. The authors of the memo are Chad Czarkowski and Phil Fauble, both of whom have extensive experience with groundwater issues with WDNR. This 2 ½ page, single-spaced memo has as its main conclusion that "the road project will not have any substantial effect [sic] on the existing pattern of groundwater flow, concentration of contaminants, nor cause any increase in health risks due to ground water contamination in the vicinity." *Id.* at 12295. In support of that conclusion, the memo noted that

> [t]he TCE seems to originate from a point approximately 1500 feet west / northwest of Hwy 164 and Sherman Road. Groundwater flow has been determined to be southeasterly from the apparent source, towards the proposed road project. The top of the water table in the gravel aquifer below the road project area is approximately 30 feet below the land surface.

*Id.* As to the concentrations of TCE, the memo stated that in the mid-1980s, area wells had been tested for TCE, and levels exceeded Wisconsin's enforcement standard of 5 ug/l. *Id.* However, the landfill "is not considered a likely source of the TCE plume because TCE has not been detected in either the landfill leachate or consistently in monitoring wells directly adjacent to the landfill." *Id.* The memo further noted that the private wells determined to be at risk from the waste disposal sites were sampled in the 1980s, and they were subsequently either abandoned altogether, abandoned and replaced with "deeper dolmite aquifer wells cased to the top of the first bedrock at 220 feet," or sampled and found clean. *Id.*

Finally, the memo considered three mechanisms by which the project could conceivably affect groundwater in the vicinity. The one relevant to this appeal is: "Driving pilings to depths greater than 30 feet could potentially encounter contaminated groundwater." *Id.* at 12296. On this issue, the memo concluded that

> such vertical steel pilings would not, in themselves, contribute any additional contaminants to the ground-water, nor significantly alter flow along any horizontal plane. Theoretically, the flow of groundwater could be altered along vertical lines due to penetration of a piling thru lenses or layers of dense, clay-rich soil known as "confining layers" or aquatards. Such layers, if present, normally act to prevent downward or upward move-ment of groundwater. A piling might compromise a confining layer by creating a narrow (0.5"-3" maximum) concentric space along the outside shaft of a piling or casing.

> However, we believe the placement of pilings will not significantly affect ground water conditions on this project. As documented by well logs and soil borings,

there is no effective, continuous confining layer in the project area. Without any effective separation of the shallow sand and gravel aquifer from the deeper dolomite aquifer, ground water already moves freely along vertical planes. In fact, several well nests near the proposed project record consistent upward gradients, an indication that deeper aquifer water is discharging into the shallower system. The relatively small increase in vertical groundwater movement which might be expected along open spaces surrounding even several dozen pilings is insignificant compared to the quantity of natural vertical movement.

In conclusion, there does not appear to be any mechanism by which the existing groundwater conditions will be significantly altered by the road project.

*Id.* at 12296-12297. On August 23, 2000, Mr. Madrzak sent an e-mail to Paul Tufts, the addressee on Mr. Gonyo's letter requesting reconsideration of the FONSI, discussing the August 22, 2000 memo:

Attached for your information is a copy of DNR's response to my request through Jay Waldschmidt for information regarding Mr. Gonyo's allegation that the project will have a significant effect on the environment with regard to hazardous materials.

The DNR note confirms the information contained in the revisions to the Environmental Assessment. The FONSI remains valid despite Mr. Gonyo's objections. We will respond accordingly to his request for FHWA to withdraw approval of the FONSI.

His other concerns regarding segmentation are adequately discussed in the revisions to the EA.

R.11, Ex.5 (attached e-mail). On August 24, 2000, the FHWA sent a letter to Mr. Gonyo responding to his July 7, 2000

letter. In accord with Mr. Madrzak's e-mail, this letter concludes that the April 2000 FONSI/EA remains valid and meets the intent and requirements of NEPA.

Citizens expressed its concerns to the United States Environmental Protection Agency ("U.S. EPA") in various petitions in the first five months of 2000, and on August 28, 2000, the WDNR sent a letter to Jan Pels of the U.S. EPA explaining its conclusions regarding the extent of the contamination plume and the Project's effect on the plume. R.38, Ex.1023, A.R. at 10166-10171. The letter concluded that "[t]here is no evidence that existing private water supply wells are being impacted by groundwater." R.38, Ex.1023, A.R. at 10171. As to the Project, it stated in full: "The WDNR has also determined that the proposed WDOT road expansion and bridge project on STH 164 will not have an adverse impact on the ground water in the Ackerville area. The rationale for this determination is detailed in the attached memo from WDNR to WDOT." *Id.* On January 12, 2001, the U.S. EPA sent Mr. Gonyo a letter regarding his request for an investigation of the Waste Management landfill. The letter stated that the WDNR is in the process of "preparing a Sampling and Analysis Plan for a [Site Inspection] of the Old Town Dump site." R.38, Ex.1024, A.R. at 10164-10165. This "Old Town Dump site" is a landfill just south and across the tracks from the Waste Management landfill, and the WDNR and U.S. EPA believed this landfill may be the actual source of the contamination. *Id.* at 10164.

On January 22, 2001, John E. Thresher, Jr., Citizens' groundwater expert, provided Fauble with criticisms of WDNR's groundwater analysis at the Waste Management landfill. This report discussed the extent and source of the TCE, concluding a "reasonable case can be made" the Waste Management landfill is the source. R.39, Ex.1025, A.R. at 12301-12304, 12307-12308. It also discussed arsenic, which

the report explained was in the vicinity of the landfill and migrating toward Ackerville, and explained that the degree and extent of arsenic is not known due to various factors. The letter concluded with a strong request that an EA be performed to address these concerns. The letter did not discuss the Ackerville Bridge Project.

On February 26, 2001, EMCS Design Group issued a report officially acknowledging the pilings for the Project would extend below groundwater level. On July 10, 2001, a public hearing was held regarding WDOT's petition to the Office of the Commissioner of Railroads of the State of Wisconsin ("OCR") for alteration and closure of crossings for purposes of the Ackerville Bridge Project. At this hearing, Mr. Gonyo and other citizens testified about their concerns regarding the environmental impacts of the Project, and Mr. Thresher, Citizens' expert, testified as to his conclusions. Mr. Bauman of WDOT also testified. On July 11, 2001, Mr. Thresher sent a follow-up letter to the hearing examiner at the OCR hearing. In that letter, he restated his position that contaminated water is moving towards Ackerville and that "[d]riving pilings through such sediments may disrupt the contaminant distribution thereby potentially contaminating additional private wells within Ackerville." R.39, Ex.1028, A.R. at 14559-14560.

In an e-mail dated July 26, 2001, Mr. Bauman of WDOT referenced a June 2001 article in *Civil Engineering* analyzing the environmental impact of pilings placed into contaminated soil entitled "Deep Foundations on Brownfield Sites." This article concluded, among other things, that "driven piles can be used on even 'brownfields' sites without causing adverse environmental effects. However, the proper type(s) of piles must be selected to avoid such effects . . . such as steel and possibly concrete to avoid internal flow." R.39, Ex.1030, A.R. at 13833.

Mr. Czarkowski of the WDNR, one of the authors of the August 22, 2000 memo that found the pilings would have only an insignificant effect on the groundwater, responded to Mr. Bauman by e-mail: "When I first reviewed the environmental concerns regarding this project as part of the team here at DNR, I was aware that pilings would be driven below depths of 30 feet, which is where the groundwater occurs. We do not dispute that a very low level of [TCE] may exist in the groundwater." R.39, Ex.1031, A.R. at 13827. Mr. Czarkowski went on to state that his opinion that the pilings would not in any way affect groundwater flow was based on the assumption the pilings would be filled with solid material. He wanted to ensure that such was the case so he could maintain his opinion, memorialized in the August 22, 2000 memo, that the pilings "should not provide a significant pathway for migration of groundwater." *Id.* Mr. Bauman responded to Mr. Czarkowski on August 27, 2001, and confirmed that the pilings would be filled with concrete. *Id.*

On September 20, 2001, the WDOT attended a meeting called by Wisconsin State Representative Suzanne Jeskewitz to discuss Mr. Gonyo's testimony at the OCR hearing. WDOT's "Public Communication Record" described the meeting in its "Discussion Summary":

> Began to discuss parts of Mr. Gonyo's testimony (13 points), but only completed first one on project cost and bridge size. Discussion then went to John Thresher's statements on potential impact of bridge piling on local groundwater contamination. Mr. Thresher states that in his opinion the WisDNR did not do a sufficient amount of study to determine the location of the contaminants and that the bridge piling could transfer the contamination to area wells.

A.R. at 10453. In the "Point Made" section of the Record, it

stated in relevant part: "WisDOT did not agree with Mr. Thresher's assertion that contaminated groundwater in the area could be impacted by our project. WisDNR has told WisDOT that pilings from the proposed structure will not cause contamination to spread to neighboring wells." *Id.*

On October 19, 2001, the OCR issued a final decision granting the petition of the WDOT to alter and close the railroad tracks in the vicinity of the project. In its final report, the OCR laid out the pilings issue and WDOT's analysis of the issue, as supported by WDNR. It concluded: "The environmental issues raised by the opponents have already been adequately addressed by the environmental assessment done by DOT. Requiring another EA or a full EIS would only serve to delay an important safety project without any likely environmental benefit." R.39, Ex.1027, A.R. at 14112.

On October 24, 2001, WDOT and WDNR representatives attended the follow-up meeting to the September 20, 2001 meeting held by Rep. Jeskewitz regarding the contamination and environmental effects of the project. One of the Public Communication Records in the record includes a "Discussion Summary" which described the substance of the meeting:

SURE expert John Thresher's position:

- Alleges that groundwater contamination plumes (TCE and Arsenic) are approaching STH 164.

- Contends that pilings from new bridges would be a mechanism for contaminated groundwater to enter area wells (offered no proof).

- Believes that Waste Management Landfill is source of contamination.

- Wants groundwater monitoring wells installed in STH

164 right-of-way to determine if contamination is present.

- If contamination is not within right-of-way, pilings will not cause contamination to enter area wells.

WisDNR's position:

- Site has been monitored since about 1980. Contamination is present in shallow groundwater.

- Mr. Thresher's information is based on 1986 data, which is considered suspect.

- Based on existing site conditions, pilings could not be a mechanism for the contaminated groundwater to enter area drinking wells.

- There is no proof that contamination is migrating towards STH 164. Appears that concentration of contamination is reducing as expected.

- There is no definitive evidence that Waste Management Landfill is source of contamination.

- Don't believe monitoring wells are needed and can't legally make Waste Management install them.

- Recommend continued testing of private drinking water wells and replacement if problem occurs.

WisDOT's position:

- Have support from all the required agencies and have followed all environmental requirements.

- Concur with WisDNR's position on pilings.

- Cited article in ENR Magazine of study done by University of New Orleans that displacement piles would not likely form conduits for contamination transfer (we are using cast-in-place concrete piling—

a displacement pile).

Rep. Jeskewitz and Sen. Darling will send letter to WisDOT requesting installation of monitoring wells in STH 164 right-of-way.

A.R. at 10440. In the next "Point Made" section of the Record, it stated: "WisDNR and WisDOT believe there is adequate proof to indicate that contamination has not migrated to the STH 164 right-of-way nor will contamination in excess of Health Advisory Limits ever migrate to the right-of-way. Further, pile driving will not cause migration even if contaminants are present." *Id.*

On November 16, 2001, Mr. Gonyo sent a letter to Terrence Mulcahy, then-Secretary of the WDOT. *Id.* at 10586. This letter discussed a Town of Polk resolution opposing the Ackerville Bridge Project and requested that the Project be immediately ended. *Id.* A December 3, 2001 letter from Secretary Mulcahy responded by acknowledging the opposition but noting that safety is the primary goal of WDOT and the bridge option provides for the best effectuation of safety and other goals for the Project. *Id.* at 10587-10588.

On December 11, 2001, the WDOT received another inquiry from Wisconsin State Representative Michael (Mickey) Lehman asking whether there was any plan to clear up the contamination plume and whether additional testing was possible. The WDOT responded on December 21, 2001, recognizing the concern but concluding:

The DNR has stated that the driving of piling into the groundwater will not cause contamination to migrate into area wells. Based on these statements from the DNR, our position is that if drinking water well contamination occurs, it will not have been caused by our project and would fall under the jurisdiction of the

> DNR. Therefore, I am forwarding your letter to Charles Krohn, Southeast Region Water Leader, DNR, and asking that they respond to your questions, since they are experts on handling groundwater contamination.

*Id.* at 10575.

On December 13, 2001, the U.S. EPA sent a letter to Mr. Gonyo responding to his letter explaining the "Resolution of the Town of Polk Electors Opposing the Ackerville Bridge" Project and the County J Project. This letter stated that based on the information it had received from WDNR, WDOT and FHWA, U.S. EPA believed the potential contamination issues had been addressed adequately in the respective EA and EIS for these projects. *Id.* at 10477. The letter also responded to Mr. Gonyo's request for a Federal Superfund cleanup of the entire landfill area west of Ackerville, Wisconsin. In that regard, the letter noted that the environmental investigation report that U.S. EPA conducted on the site revealed no direct contact threats to the soil at the site and that there is no observed release of groundwater that can be attributed directly to the site. *Id.* "Therefore, the U.S. EPA did not recommend further investigation of the subject landfill." *Id.*

Another public meeting on the contamination plume was held on January 30, 2002, at which State Representatives and Senators requested installation of monitoring wells in Ackerville. In a February 4, 2002 document entitled "Summary of the Groundwater Contamination in the Ackerville Area Washington County, Wisconsin," Mr. Thresher again concluded that the contamination threatened Ackerville residents and discussed the pilings. On February 26, 2002, a document entitled "Public Health Assessment for Ackerville Area Groundwater" was released by the Wisconsin Department of Health and Family Services, Division of Public Health, on behalf of WDNR, the Washington County

Health Department, and the Agency for Toxic Substances and Disease Registery. The Assessment concluded: "There is no relationship between the proposed bridge construction project and area groundwater quality. The groundwater is 30 feet below the ground surface and will not be affected by the bridge or road construction." R.38, Ex.1039, A.R. at 10154.

On February 27, 2002, then-WDOT Secretary Gene E. Kussart sent letters to the various state Representatives and Senators who had requested testing at the January 30, 2002 meeting, stating: "Although the [WDOT] has conformed to all environmental requirements for this project and [WDNR] and [FHWA] have indicated that our improvement project will not impact the groundwater, I have decided to accommodate your request." R.39, Ex.1036, A.R. at 10545-10548. These wells were installed by STS Consultants in the vicinity of the Project for the purpose of "determin[ing] potential impacts of upgradient groundwater contaminant sources on areas of bridge pile support installation." R.39, Ex.1038, A.R. at 10086. In an April 8, 2002 memorandum to "Files," Mr. Bauman of WDOT noted the wells should be installed before construction and tested within a week of installation and quarterly for two years thereafter. The memo also noted:

> WisDOT intends to turn over the results of all tests to the WisDNR for their use. It is our opinion that the WisDNR will be responsible to pursue and oversee any actions needed in response to the test results. The WisDOT, Dept. of Health and Family Services and the WisDNR all believe this project will not impact the groundwater in the project area whether contamination is present in the right-of-way or not. Therefore, we expect that regardless of what is found in the tested wells the project will not be delayed or changed in any way.

R.39, Ex.1039A, A.R. at 10119. In an e-mail dated April 24, 2002, Mr. Wade of WDOT reached the following conclusion based on the initial sampling results from the new monitoring wells:

> The confirmation of permeable aquifer materials, upward hydraulic gradients, low contaminant concentrations, and lack of any apparent contaminant source in the immediate project area all reinforce our earlier conclusion that the project activities, including the driving of piles, will have no significant impact on the continuing migration of the contaminants in the project area. No modification of the highway project should be required.

R.39, Ex.1040, A.R. at 10079. In a May 2, 2002 memorandum from Mr. Fauble of WDNR to Mr. Wade of WDOT, Mr. Fauble stated that, per Mr. Wade's request, he had reviewed the initial monitoring data and that none of the data contradict his and Mr. Czarkowski's August 22, 2000 memo. Specifically, he noted that TCE levels were well below state enforcement standards, there were no detects of arsenic, and there were very low VOC detects.

Construction began on the Project in May of 2002, including the insertion of the pilings. On May 15, 2002, the U.S. EPA sent a letter to U.S. Senator Russ Feingold of Wisconsin concluding that the "U.S. EPA has determined that the Ackerville project will not significantly impact groundwater quality." A.R. at 10474-10475. On June 25, 2002, the U.S. EPA sent "a follow-up letter" to a June 5, 2002 meeting that included Mr. Gonyo, other citizens and U.S. EPA staff. The letter noted that EPA staff "confirmed and reiterated" its position in the June 5th meeting that the "U.S. EPA does not believe that the Ackerville project will significantly alter long-term groundwater quality in this area," and the letter also stated the agency does not believe

sufficient reason exists to change its position. R.48 at 2.

By the time Citizens filed this lawsuit on July 3, 2002, 150 of the 177 pilings (84%) necessary for the Project already had been inserted. On November 21, 2002, Mr. Bauman of WDOT sent a memorandum with the new monitoring well results. R.39, Ex.1046 at 1. The memo noted that TCE levels were well below detectable limits, arsenic levels had increased in two wells but were well below the DNR Prevention Action Limit, and that WDOT continued to believe the Project would not have a significant effect on the groundwater in Ackerville. *Id.*

### 2.   County J/Highway 164 Project (Project # 2748-01-01)

On April 9, 2001, a final Environmental Impact Statement ("EIS") was approved by the FHWA for the County J/Highway 164 Project for distribution to agencies and the public. On March 6, 2002, the FHWA adopted the selected alternative that was set forth in the EIS for "WisDOT Project I.D. 2748-01-01." R.39, Ex.1045 at 12. This alternative "widen[s] County J/WIS 164 on its present alignment, and incorporates the existing roadway as part of the ultimate 4-lane facility." *Id.* at VI. The Project extends for approximately 18 miles and abuts the Ackerville Bridge Project at its northernmost end. *Id.* at IV. The key objectives for this road-widening project include providing for increasing traffic demands and addressing safety concerns due to the traffic and current inadequacies of the roadway. *Id.* at IV-VI.

### B.   District Court Proceedings

On June 12, 2003, the district court denied Citizens' motion for a preliminary injunction and ruled against Citizens on the merits. Before turning to the merits, the district court determined that the standing requirement was satisfied by at least some of Citizens' individual members,

as well as the association itself. It also held that Citizens' claims were not moot or barred by the doctrine of laches because Citizens had filed after 150 of the 177 pilings (84%) necessary for the Ackerville Bridge Project were already in the ground. Both of these issues were thoroughly and correctly analyzed by the district court, and we shall not further discuss them.

As to the merits, the district court first determined that, overall, the defendants had taken the requisite "hard look" at the environmental consequences of the Project. Second, the court held that the defendants had considered sufficiently reasonable alternatives and had "made a fully informed decision to proceed with the alternative involving the overpass structure." R.52 at 54. Finally, the court determined that the defendants made a "reasonable decision in establishing the project termini" and that the Ackerville Bridge Project had not been improperly segmented from the County J/Highway 164 Project. *Id.* at 56.

## II

## DISCUSSION

### A. "Hard Look" at Environmental Consequences

This court's review of agency action under NEPA is governed by the APA. *See Indiana Forest Alliance, Inc. v. United States Forest Serv.*, 325 F.3d 851, 858 (7th Cir. 2003). The APA instructs courts to set aside agency action only if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law." 5 U.S.C. § 706(2)(A). Under this standard, our inquiry is "searching and careful" but "the ultimate standard of review is a narrow one." *Marsh v. Oregon Natural Res. Council*, 490 U.S. 360, 378 (1989) (internal quotations and citations omitted). We only must

ask "whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Id.* "If an agency considers the proper factors and makes a factual determination on whether the environmental impacts are significant or not, that decision implicates substantial agency expertise and is entitled to deference." *Indiana Forest Alliance*, 325 F.3d at 859. In the context of NEPA, arbitrary and capricious review prohibits a court from "substitut[ing] its judgment for that of the agency as to the environmental consequences of its actions." *Kleppe v. Sierra Club*, 427 U.S. 390, 410 n.21 (1976). In fact, "[t]he only role" for a court in applying the arbitrary and capricious standard in the NEPA context "is to insure that the agency has taken a 'hard look' at environmental consequences." *Id.*

NEPA sets forth a broad national commitment to protecting and promoting the environment. *See Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 349 (1989). Like the APA, NEPA "does not mandate particular results, but simply prescribes the necessary process. If the adverse environmental effects of the proposed action are adequately identified and evaluated, the agency is not constrained by NEPA from deciding that other values outweigh the environmental costs." *Id.* (internal citations omitted). One process required under NEPA is that all federal agencies must prepare an "environmental impact statement" ("EIS") for "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C); *see also Heartwood, Inc. v. United States Forest Serv.*, 230 F.3d 947, 949 (7th Cir. 2000). This report is "a detailed analysis and study conducted to determine if, or the extent to which, a particular agency action will impact the environment." *Heartwood*, 230 F.3d at 949.

In evaluating whether an EIS is necessary, Council on

Environmental Quality ("CEQ") regulations instruct that the term "significantly" in the statute requires consideration of both "context" and "intensity." 40 C.F.R. § 1508.27(a)-(b). Intensity in turn requires agencies to consider, among other factors, "the degree to which the proposed action affects public health and safety"; "the degree to which the effects on the quality of the human environment are likely to be highly controversial"; and "the degree to which the possible effects on the human environment are highly uncertain or involve unique or unknown risks." *Id.* § 1508.27(b)(2), (4), (5).

These considerations are often spelled out in the pre-liminary stages of a proposed project in an environmental assessment ("EA"). An EA is a shorter, rough-cut, low-budget EIS which is mandated when, as here, proposed action is neither one normally requiring an EIS nor one categorically excluded from the EIS process. *See* 40 C.F.R. § 1508.9; 23 C.F.R. § 771.115(c); *Indiana Forest Alliance*, 325 F.3d at 856. Among other information, it "provide[s] evidence and analysis that establish[es] whether or not an EIS or a Finding of No Significant Impact ('FONSI') should be prepared." 40 C.F.R. § 1508.9(a)(1); *see also Rhodes v. Johnson*, 153 F.3d 785, 788 (7th Cir. 1998).

In this case, Citizens alleges that the defendants failed to take a "hard look" at the environmental consequences of the Ackerville Bridge Project and that an EIS is required for the Project under NEPA and its implementing regulations. In assessing these contentions, we must, as a threshold matter, state with precision the question at issue. Both parties agree there are contaminants in the groundwater in the general vicinity of the Ackerville Bridge Project. They disagree as to the source of the contaminants and the extent of the threat posed by the contaminants. Citizens claims the source is the Waste Management landfill. The defendants are not sure

what the precise source is. Citizens claims the levels of con-taminants are unsafe. The defendants believe they are not. Regardless of the source and extent of the contaminants, the key question is whether there is a nexus between the Ackerville Bridge Project, which the defendants are imple-menting and which NEPA and its regulations govern, and the *preexisting* contamination in the general vicinity, which, apart from the Project, NEPA and its regulations do not affect.

In this action, the only possible mechanism by which Citizens claims the Project will exacerbate this preexisting condition is through the bridge pilings. In their view, when driven into the groundwater, the pilings will create a zone of permeability that will allow the contaminants to flow to the private drinking water of Ackerville citizens. Thus, the narrow question before us is whether the pilings needed for the bridge will advance or exacerbate the migration of contaminated water toward private wells in the Ackerville area.[3]

---

[3] Citizens puts a great deal of emphasis in its argument on the allegation that the defendants did not adequately determine the source and extent of the contamination, especially the extent of arsenic, before proceeding with a finding of no significant impact and with construction. *See, e.g.*, Appellant's Br. at 28, 31-32, 36-37. As a threshold matter, we note that the defendants did explore the levels of contamination both before and after the April 2000 EA/FONSI enough to determine that there was preexisting contamination, at least in small amounts, and to determine that the Project itself did not threaten to exacerbate the contamination without some mechanism to advance it toward the Ackerville drinking water. *See* R.38, Ex.1003, A.R. at 00002; R.38, Ex.1015, A.R. at 00714; R.38, Ex.1020, A.R. at 12295. Nevertheless, Citizens' argument misses the point. Again, we emphasize that the
(continued...)

Citizens, through its expert, Mr. Thresher, claim that "the coarse grains along the boundaries of the driven pilings would rotate due to the shearing thereby increasing the porosity, and consequently the permeability, of the sands and gravels near the pilings." Appellant's Br. at 34. This is the principle of dilatancy, and in this case, it means the driving of pilings will create a zone of permeability (a space that chemicals can pass through) around the outside of the pilings that would allow contamination from lower levels to migrate upward and eventually into private drinking wells and water. *Id.* Defendants through their experts at the WDNR disagree and instead believe that the "relatively small increase in vertical groundwater movement which

---

[3] (...continued)
defendants' liability under NEPA and its implementing regulations rests on a nexus between their Project and the preexisting contamination. If the Project has no significant effect on the contamination, the contamination is still a problem, but it is a problem that does not fall under the jurisdiction of the FHWA and WDOT. Rather, it falls under the U.S. EPA and WDNR which are charged with maintaining the quality of groundwater for our citizens. In fact, both in relation to and apart from this Project, the U.S. EPA and WDNR have been monitoring the contamination and its effect on the groundwater in Ackerville for some time. *See* R.38, Ex.1024, A.R. at 10164-10165; A.R. at 10476-10477.

In sum, NEPA requires agencies to take a "hard look" at the environmental consequences *of their projects. Kleppe v. Sierra Club,* 427 U.S. 390, 410 n.21 (1976). If an agency's project does not *itself* "significantly" affect the environment, then neither NEPA nor its implementing regulations require an agency to perform an EIS or to remedy a preexisting environmental problem merely because the project happens to take place in the vicinity of that preexisting environmental problem. *See* 42 U.S.C. § 4332(2)(C); 40 C.F.R. § 1508 (discussing "effects" which "are caused *by the action*") (emphasis added).

might be expected along open spaces surrounding even several dozen pilings is insignificant compared to the quantity of natural vertical movement." R.38, Ex.1020, A.R. at 12295. Again, we emphasize that we do not approach this dispute as a panel of environmental experts attempting to decide which party is correct. We only review whether the agencies charged with carrying out this project took a "hard look" at the relevant information and consequences and made an informed judgment.

The April 2000 EA/FONSI for the Ackerville Bridge Project does not contain a specific discussion of the effects of the pilings. Rather, it discusses the required excavation, noting it will not reach the groundwater, and concludes: "The Department has determined that the potential for encountering and impacting hazardous materials during construction of this project does not exist. Therefore, there is no purpose or need for preparation of an EIS." R.38, Ex.1003, A.R. at 00005. Other contemporaneous documents do contain general conclusions that the pilings will have no effect on the contamination. For example, the Addendum to the Phase 1 Report, also released in April of 2000, states without elaboration that it is "unlikely the pilings for the structure supports . . . will cause an impact on plume movement or concentrations." R.38, Ex.1015, A.R. at 00714. Likewise, Mr. Wade, a Hazardous Materials Engineer for WDOT, concluded in a March 14, 2000 letter that "it is also unlikely that project pilings or water detention/infiltration basins will cause an impact on plume movement or concentrations." R.38, Ex.1009, A.R. at 00728. Although based on the evidence in the record, we believe the defendants knew the pilings would extend into the groundwater when

the April 2000 EA/FONSI was issued,[4] there is no "hard

---

[4] The first, official, public acknowledgment that the pilings would extend into the groundwater was an EMCS report dated February 26, 2001. However, the defendants explain that they had assumed before the issuance of the April 2000 EA/FONSI that the pilings would extend below the groundwater, and though ambiguous, the most plausible inference from the record is that they in fact made that assumption. For example, the defendants asked the question in a "Fact Sheet/Topics of Concern" dated February 15, 2000: "If there is contamination in the shallow groundwater, couldn't the structure pilings create a 'channel' to contaminate [sic] the deep groundwater where our drinking water comes from?" R.38, Ex.1008, A.R. at 00146. In a March 24, 2000 letter from Ken Wade of WDOT to EMCS, Mr. Wade stated:

> The water table for this region is approximately 30 feet below the ground surface. If construction plans for the footings require only 4 to 5 feet of excavation, it is very unlikely that contaminated groundwater will impact the project.
>
> *It is also unlikely* that project pilings . . . will cause an impact on plume movement or concentrations.

R.38, Ex.1009, A.R. at 00728 (emphasis added). This language is mirrored in the April 2000 Addendum. R.38, Ex.1015, A.R. at 00714. Furthermore, just months after the issuance of the April 2000 EA/FONSI, Mr. Gonyo wrote a letter to the FHWA requesting reconsideration of the FONSI, and this letter stated: "[T]he pilings will have to be driven into and below the contaminated groundwater table." R.38, Ex.1017 at 2. Finally, the WDNR was involved in this Project well before the issuance of the April 2000 EA/FONSI, *see* R.38, Ex.1003, A.R. at 00005 (Basic Sheet 2) (discussing "extensive coordination" with the WDNR in finding no significant impact), and Mr. Fauble of WDNR later noted in a correspondence: "When I first reviewed the environmental concerns regarding this project as part of the team here at DNR, I was aware that pilings would be driven below depths of 30 feet,

(continued...)

look" analysis to support the conclusion reached by the defendants that the pilings would not have a significant effect. Indeed, the defendants appear to acknowledge there was not a "hard look" analysis of the effect of the pilings in April of 2000; instead, the defendants rely on the post-EA/FONSI, August 22, 2000 memo of their experts at the WDNR as the basis for their "hard look." *See* R.29 at 11 (defendants' answers to district court's questions) ("The specific question as to how the pilings would affect groundwater and more particularly, the movement of arsenic and TCE was *fully addressed after the FONSI* on a number of occasions by various persons.") (emphasis added); Appellees' Br. at 49 (stating that "the timing of the final determination of the depth that the pilings would extend into the ground is of little relevance based upon the findings the WDNR reached in its August 22, 2000, memorandum").

After the issuance of the final EA/FONSI, Mr. Gonyo requested reconsideration of the defendants' decision in his July 7, 2000 letter to the FHWA. One concern specifically raised is that "the pilings will have to be driven into and below the contaminated groundwater table." R.38, Ex.1017 at 2. The FHWA and WDOT were responsive to Mr. Gonyo's request and solicited the help of the experts at the WDNR in reevaluating the Project's impacts, including the effect of driving the pilings into the groundwater table, in order to respond to Mr. Gonyo. This exchange resulted in the August 22, 2000 WDNR memorandum authored by Mr. Czarkowski and Mr. Fauble, which states that "[d]riving pilings to depths greater than 30 feet could potentially encounter contaminated groundwater." R.38, Ex.1020, A.R.

---

[4] (...continued)
which is where the groundwater occurs." R.39, Ex.1031, A.R. at 13827.

at 12296. However, the memo goes on to conclude that the "relatively small increase in vertical groundwater movement which might be expected along open spaces surrounding even several dozen pilings is insignificant compared to the quantity of natural vertical movement." *Id.* at 12297. As required by NEPA, this conclusion was "based on a consideration of the relevant factors," *Marsh v. Oregon Natural Res. Council*, 490 U.S. 360, 378 (1989) (internal quotations and citations omitted), specifically, the makeup of the soil into which the pilings were to be driven, R.38, Ex.1020, A.R. at 12296. It also was not "clear error of judgment." *Marsh*, 490 U.S. at 378 (internal quotations and citations omitted). Finally, the conclusion was arrived at by the defendants' experts, on which they were entitled to rely to the exclusion of Citizens' expert. *Id.* ("When specialists express conflicting views, an agency must have discretion to rely on the reasonable opinions of its own qualified experts even if, as an original matter, a court might find contrary views more persuasive."). At this point, the defendants had taken a "hard look" and were in full compliance with NEPA and its regulations.

Although we could stop here, we have gone to great lengths in reciting the facts to demonstrate that from August of 2000 to the beginning of the construction in May of 2002, the defendants did not ignore Citizens' concerns. Rather, the defendants attended meetings with state legislators in which Citizens' representatives expressed their concerns, responded to Citizens' various requests for information and reconsideration, ultimately agreed to install private monitoring wells to study the contamination despite the belief the Project would have no significant impact on the contamination, and reviewed, and had the WDNR review, the results of the initial monitoring from the newly installed wells and any effects those results might have on the Project. In addressing Citizens' concerns, the defendants

and WDNR also worked with other agencies including the U.S. EPA, Wisconsin OCR, and the Wisconsin Department of Health and Family Services, all of which confirmed the defendants' conclusion that the Project would not significantly affect the groundwater contamination. To be sure, the defendants did not change their position as result of Citizens' requests and challenges, but they were not required to do so. *See Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350 (1989) (stating that NEPA "simply prescribes the necessary process" but "itself does not mandate particular results" (citations omitted)).

In taking a hard look at the environmental consequences, the the defendants also made a reasoned determination that an EIS was not required. As noted previously, an EIS is only required for "major Federal actions *significantly* affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C) (emphasis added). According to CEQ regulations, "significantly" requires an agency to consider the "context" and "intensity" of a project's environmental consequences. *See* 40 C.F.R. § 1508.27(a)-(b). Citizens claims the defendants failed to consider three factors that CEQ regulations instruct agencies to "consider[]" under the intensity prong. *See id.* § 1508.27(b). First, it claims the defendants failed to consider "the degree to which the proposed action affects public health and safety." *Id.* § 1508.27(b)(2). The defendants, however, did consider this factor but found the Project, and specific to this litigation, the pilings, would have an insignificant effect. This factor must also be read in the context of the regulation's instruction that agencies consider "[i]mpacts that may be both beneficial and adverse." *Id.* § 1508.27(b)(1). The defendants found not only that the negative environmental impacts of the Project were insignificant, but also that the Ackerville Bridge Project was the best way to solve serious safety problems with the current roadway facility.

The defendants also did not fail to consider "the degree to which the effects on the quality of the human environment are likely to be highly controversial." *Id.* § 1508.27(b)(4). Citizens has met its initial burden of establishing that the Project was highly controversial, as we recently defined that term in *Indiana Forest Alliance, Inc. v. United States Forest Service*, 325 F.3d 851, 858 (7th Cir. 2003) ("[T]his factor considers whether there is a substantial dispute about the size, nature or effect of an action in the relevant community."). However, that is only the first step in the analysis. As we further explained in *Indiana Forest Alliance*, if the plaintiff meets the initial burden,

> the agency must consider the dispute and address the concerns in its final decision. This two-step approach recognizes that as long as the agency has taken a "hard look" at the relevant issues involved in the preparation of an EIS and satisfactorily explained its subsequent decision, the agency decision should not be set aside.

*Id.* at 858. In this case, the defendants did just that. *See* R.38, Ex.1020, A.R. at 12295-12296; R.38, Ex.1022, A.R. at 06225. The mere fact that there is still disagreement or that Citizens' expert disagrees with the defendants' experts does not render the defendants out of compliance under this factor. *See Indiana Forest Alliance*, 325 F.3d at 861 (citing multiple cases for the proposition that scientific dispute does not render an agency's action arbitrary and capricious).

Finally, the defendants considered "the degree to which the possible effects on the human environment are highly uncertain or involve unique or unknown risks." 40 C.F.R. § 1508.27(b)(5). Although they acknowledged uncertainty as to the *source and extent of the threat of the contaminants* to the Ackerville area, they found with certainty that the *Project's effects* on the contamination and environment were insignificant. That conclusion was informed and reasoned, and thus

cannot be second-guessed. *See Marsh*, 490 U.S. at 378. In summary, we hold that the defendants took a "hard look" at the environmental consequences and in doing so, made an informed and reasoned determination that no EIS was required for the Project.

Before moving on, we must address one last contention by Citizens. Citizens argues that this analysis is faulty because, temporally, our "hard look" analysis should extend only to April of 2000, when the defendants formally issued the EA/FONSI. The defendants did not stop with the issuance of the EA/FONSI, however, and we believe neither should our analysis. First, we do not believe this runs afoul of the administrative record requirement. "[T]he focal point for judicial review should be the administrative record already in existence, not some new record made initially in the reviewing court." *Camp v. Pitts*, 411 U.S. 138, 142 (1973). The "hard look" inquiry is focused on "the full administrative record that was before the Secretary *at the time he made his decision.*" *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 420 (1971) (emphasis added), *overruled on other grounds by Califano v. Sanders*, 430 U.S. 99, 105 (1977). Although the *formal* "decision" of no significant impact was made at the time of the April 2000 EA/FONSI in this case, the defendants reconsidered their position pursuant to the July 7, 2000 request of Mr. Gonyo. With the analysis of the experts at the WDNR, as memorialized in the August 22, 2000 memo, the defendants took a "hard look" at the consequences of the pilings and made a further "decision" that the EA/FONSI was valid and thus there was no need to withdraw the documents. Mr. Madrzak of the FHWA e-mailed Mr. Tufts of the FHWA, the addressee of Mr. Gonyo's request, following completion of the August 22, 2000 memo: "The DNR note [August 22, 2000 memo] confirms the information contained in the revisions to the Environmental Assessment. The FONSI remains valid

despite Mr. Gonyo's objections. We will respond accordingly to his request for FHWA to withdraw approval of the FONSI." R.11, Ex.5 (attached e-mail).

The purpose of confining judicial review to the administrative record is to ensure that agencies adequately evaluate their proposed course of action *before* they act and do not simply attempt to justify rash, uniformed actions through " '*post hoc*' rationalizations" once they are aware they are being sued. *Citizens to Preserve Overton Park*, 401 U.S. at 419 (quoting *Burlington Truck Lines v. United States*, 371 U.S. 156, 168-69 (1962)). The defendants in this case did not begin construction until May of 2002 and were not informed they were being sued until about the same time. *See* R.52 at 40-41. Therefore, the documents in the record that were developed in the months following the issuance of the April 2000 EA/FONSI, including the August 22, 2000 memo, were analyzed approximately a year and a half before the defendants even knew they were being sued and took the action, the construction, in dispute. These documents establish that in reconsidering the decision to release the EA/FONSI, the defendants did indeed take a "hard look" at the possibility of increased contamination caused by the pilings. This is not the kind of post-hoc rationalization the Supreme Court has counseled against through the administrative record requirement. *See Citizens to Preserve Overton Park*, 401 U.S. at 419 (discussing the invalidity of affidavits prepared for litigation). To now ignore the analysis in the months subsequent to the formal EA/FONSI would not only require us to elevate form over substance, but it would also require us to ignore the fundamental purpose of NEPA, to ensure that agencies consider the environmental consequences of their actions before they act, which was satisfied in this case. *See Marsh*, 490 U.S. at 371.

Beyond the relevant administrative record, our position might be criticized for looking past the date on which the defendants officially stamped the EA/FONSI because these documents are intended to be the culmination of an agency's environmental assessment. *Cf. Southwest Williamson County Cmty. Ass'n v. Slater*, 976 F. Supp. 1119, 1123 (M.D. Tenn. 1997) (finding that the issuance of an EIS is a final agency action), *aff'd in part and vacated in part*, 173 F.3d 1033 (6th Cir. 1999). NEPA and its regulations require agencies to take a "hard look" at the "significance" of the consequences of their actions before issuing an EA/FONSI, *see* 42 U.S.C. § 4332(2)(C), but also contemplate the reality that, after the formal issuance of an EIS or EA/FONSI, it is often the case that new information comes to light or the project changes. *See Marsh*, 490 U.S. at 370-84 (discussing what is required of an agency under the regulations when a project changes or new information comes to light after the formal issuance of an EIS). Here, we have an analogous situation. A known issue came into sharper focus after the formal environmental documents were issued. The defendants apparently had considered the effect of driving the pilings into and below the groundwater table before the April 2000 EA/FONSI, and had concluded that the pilings would have no effect on the contamination. However, when Mr. Gonyo requested reconsideration of the FONSI, the full import of the issue became clear, and the defendants did a reevaluation, specifically analyzing the effect of the pilings.

In this regard, the Supreme Court has instructed that "NEPA does require that agencies take a 'hard look' at the environmental effects of their planned action, even after a proposal has received initial approval." *See Marsh*, 490 U.S. at 374. FHWA regulations implementing NEPA accordingly require that "[a]fter approval of the . . . FONSI . . ., the applicant shall consult with the Administration prior to requesting any major approvals or grants to establish

whether or not the approved environmental document . . . remains valid for the requested Administration action." 23 C.F.R. § 771.129(c). As our analysis above demonstrates, the defendants in this case took a "hard look" at the environmental effects of the Project, specifically, the pilings, in the months following the formal issuance of the EA/FONSI, and determined the previous EA/FONSI remained valid. This action put them in substantial compliance with NEPA.

Not only are agencies required to reevaluate their original documents, but sometimes they are also required to supplement formally the prior environmental documents. NEPA itself does not expressly address post-decision supplements to an EA/FONSI, and neither do the implementing regulations. The regulations do discuss when an EIS must be formally supplemented, and the Supreme Court has elaborated on this requirement. *See Marsh*, 490 U.S. at 370-84; 40 C.F.R. § 1502.9(c); 23 C.F.R. § 771.130. Nevertheless, 23 C.F.R. § 771.129(c), quoted above, necessarily requires that an inadequate FONSI be formally supplemented if it no longer "remains valid." *Id.* In this case, the defendants determined that the impacts of the pilings were insignificant and that the EA/FONSI remained valid; thus, no supplementation was required. *See Marsh*, 490 U.S. at 385 ("[H]aving [taken a 'hard look' at the proffered evidence] and having determined based on careful scientific analysis that the new information was of exaggerated importance, the Corps acted within the dictates of NEPA in concluding that supplementation was unnecessary."); *Price Rd. Neighborhood Ass'n, Inc. v. United States Dep't of Trans.*, 113 F.3d 1505, 1510 (9th Cir. 1997) (finding supplementation to the EA/FONSI unnecessary when the FHWA and Arizona Department of Transportation reevaluation revealed there were no "discernable" differences in environmental effects from the change in the project); *Vine Street Concerned Citizens, Inc. v. Dole*, 630 F. Supp. 24, 29 (E.D. Pa. 1985) ("The

projected increase in the Expressway traffic is not quantitatively or qualitatively significantly different from what was considered in the FEIS"; therefore, no formal supplementation is required.). Furthermore, we agree with the district court that the defendants, in effect, created a de facto supplement to the EA, which was the basis of their "decision" that the FONSI was still valid. *See Lake Region Legal Defense Fund, Inc. v. Slater*, 986 F. Supp. 1169, 1196 (N.D. Iowa 1997) (finding that although a "formal 'supplemental EA' has not been prepared in this case," "the administrative record indicates that the defendants have continued to review the impacts associated with changed conditions in the Highway 71 project"). Finally, we note that to remand with an order that the defendants formally supplement the EA and republish the FONSI at this late date, when NEPA's letter and spirit have been complied with, when the pilings are in the ground, and when the bridge is up, would be futile. *See Cronin v. United States Dep't of Agric.*, 919 F.2d 439, 443 (7th Cir. 1990) (noting that a court need not remand a case if doing so would be futile).

## B.   Reasonable Alternatives

NEPA requires that agencies "study, develop, and describe appropriate alternatives" to major federal projects. 42 U.S.C. § 4332(2)(C)(iii) & (2)(E). The inquiry into consideration of reasonable alternatives is "independent of the question of environmental impact statements, and operative even if the agency finds no significant environmental impact." *River Rd. Alliance, Inc. v. Corps of Eng'rs of United States Army*, 764 F.2d 445, 452 (7th Cir. 1985). This does not mean, however, that courts should ignore the context in which alternatives are considered. When, as here, an agency makes an informed decision that the environmental impact

will be small, a view which we are required to accord deference, a "less extensive" search is required. *Id.* ("[T]he smaller the impact, the less extensive a search for alternatives can the agency reasonably be required to conduct."). Some courts frame this sliding-scale approach as a "rule of reason" inquiry, which governs "both *which* alternatives the agency must discuss, and the *extent* to which it must discuss them." *See Citizens Against Burlington, Inc. v. Busey*, 938 F.2d 190, 195 (D.C. Cir. 1991) (quoting *Alaska v. Andrus*, 580 F.2d 465, 475 (D.C. Cir. 1978)). Again, our review is not of the agency's substantive judgment, but of the sufficiency of the agency's consideration of the reasonable alternatives. *See Methow Valley*, 490 U.S. at 350 ("[I]t is now well settled that NEPA itself does not mandate particular results, but simply prescribes the necessary process." (citations omitted)).

We have stated that logically and legally, an agency is required to address three questions in considering alternatives. *See Simmons v. United States Army Corps of Eng'rs*, 120 F.3d 664, 668 (7th Cir. 1997). "First, what is the purpose of the proposed project (major federal action)? Second, given that purpose, what are the reasonable alternatives to the project? And third, to what extent should the agency explore each particular reasonable alternative?" *Id.*

The defendants set forth three purposes for the Ackerville Bridge Project. The "primary purpose" is to address safety considerations flowing from the layout of the roads and the close proximity of the railroads. R.38, Ex.1003, A.R. at 00004. Another purpose is to bring the existing facility into compliance with State Trunk Highway standards, which govern the necessary requirements for a road to support truck traffic. *Id.* at 00013. A "secondary purpose" is to provide for future expansion of the roadways due to increasing traffic in the region. *Id.* at 00004.

Given these three purposes, we hold the defendants

considered a sufficient number of reasonable alternatives and explored them to the extent necessary for this Project. *See Simmons*, 120 F.3d at 668. In its "Summary of the alternatives considered" in the EA/FONSI, the defendants first considered a "No Action" alternative, under which no action would be taken other than routine maintenance. R.38, Ex.1003, A.R. at 00013. However, they concluded this alternative did not address any of the concerns with the existing roadway facility. The defendants also discussed their "Recommended Alternative," which was eventually implemented. *Id.* Finally, they considered four "Other Alternatives," but found them all lacking for various reasons, including safety concerns and cost-efficiency. *Id.*

The defendants also specifically responded to the alternative Citizens urged, and which Citizens now claims was rejected for pretextual reasons. Citizens' proposal included re-aligning the intersection at STH 164 and STH 175 to a right angle, reducing the steep hills along STH 164/STH 175 to a right angle, adding traffic gates at the railroad crossings, and adding signals at the STH 164/STH 175 intersection. Citizens alleges that this option was rejected because the defendants' true primary motive for some time has been a "desire to preserve a corridor for a possible future 4-lane roadway." Appellant's Br. at 42 (quoting A.R. at 00004). This purpose is why the defendants opted for building an overpass structure instead of opting for its proposal, which would adequately address the safety concerns. *Id.*

As an initial matter, this view of pretextual motive is not supported in the record. The EA/FONSI states:

> The main purpose and immediate need for the STH 175 to STH 60 project is to correct a safety problem at the STH 164/175 intersection, correct a hazardous at-grade train crossing on STH 164 by building a bridge to cross

over the train tracks and reconstruct the existing 2-land roadway to correct a deteriorating pavement situation. A secondary focus of the project is to preserve a corridor for a possible future 4-lane roadway.

R.38, Ex.1003, A.R. at 00004. This prioritization is confirmed in multiple other documents. For example, the defendants performed an "Accident Analysis Report," which analyzes the safety concerns necessitating this Project and provides ample statistical data on the safety issues. R.38, Ex.1004, A.R. at 05409-05415.

Regardless, the defendants specifically analyzed Citizens' proposal and found it lacking with respect to all three purposes of the Project:

Substantial impacts to the town of Ackerville would occur by re-aligning either roadway. Adding gates at the railroad crossings would not address the fact that there are currently long delays due to the amount of train traffic here. This will only worsen in the future since Wisconsin Central Limited has plans to double the train traffic on these lines. The installation of signals does not guarantee safety. The close proximity of the railroad tracks to the intersection may cause traffic to back-up past the tracks while waiting to clear the intersection. This proposal does not address the need for the project in regards to state trunk highway standards. The 11% grade just north of the intersection, inadequate shoulder widths, poor pavement structure, and the inadequate stopping sight distances throughout the project are all substantial features of this highway which are not addressed. Also, the need for future expansion to 4 lanes has not been addressed.

R.38, Ex.1003, A.R. at 00006.

Given that the environmental impacts of this Project were

found by the defendants to be insignificant, the defendants satisfied the requirement that they consider reasonable alternatives. We are not entitled to second-guess the defendants' reasoned and informed determination that the public interest, including the public safety, would be better served if the preferred alternative were built.

## C.  Segmentation

Segmentation, as the name suggests, addresses an agency's decision on where one project ends and another begins. "In order to ensure meaningful evaluation of alternatives and to avoid commitments to transportation improvements before they are fully evaluated," FHWA regulations require that each action evaluated in an EIS or FONSI:

> (1) Connect logical termini and be of sufficient length to address environmental matters on a broad scope;

> (2) Have independent utility or independent significance, i.e., be usable and be a reasonable expenditure even if no additional transportation improvements are made; and

> (3) Not restrict consideration of alternatives for other reasonably foreseeable transportation improvements.

23 C.F.R. § 771.111(f)(1)-(3).

"Piecemealing" or "segmentation," which Citizens alleges occurred in this case, "allows an agency to avoid the NEPA requirement that an EIS be prepared for all major federal action with significant environmental impacts by segmenting an overall plan into smaller parts involving action with less significant environmental effects." *City of West Chicago v. United States Nuclear Regulatory Comm'n*, 701 F.2d 632, 650 (7th Cir. 1983). The purpose of segmentation review is not

for a court to decide whether or not an agency drew the correct lines when putting the boundaries on its projects. Rather, "[s]egmentation analysis functions to weed out projects which are pretextually segmented, *and* for which there is no independent reason to exist. When the segmentation project has *no* independent justification, no life of its own, or is simply illogical when viewed in isolation, the segmentation will be held invalid." *Save Barton Creek Ass'n v. FHWA*, 950 F.2d 1129, 1139 (5th Cir. 1992) (internal quotations and citations omitted). Thus, we are looking for agency action that ignored, or gave insufficient weight to, the factors set out in the regulations in an attempt to avoid the requirements of NEPA.

Citizens claims the County J/Highway 164 Project was impermissibly segmented from the Ackerville Bridge Project to allow the defendants to avoid performing an EIS on the Ackerville Bridge Project. The County J/Highway 164 Project is 18.1 miles and its northernmost point abuts the Ackerville Bridge Project, which is 1.3 miles. Thus, Citizens asserts, of the 19.4 miles of the highway being worked on, only 1.3 miles will not be the subject of an EIS, and this 1.3 miles includes the contamination plume. Furthermore, Citizens submits that the "logical terminus is Hwy. 60, not an artificial part on a hilltop 1.3 miles south of Hwy. 60." Appellant's Br. at 43.

We agree with the district court that these arguments are not persuasive. In the EA/FONSI, the defendants explicitly considered the three criteria for segmentation set out in 23 C.F.R. § 771.111, and gave a reasoned justification of how their segmentation fit each factor. As to logical termini, the defendants explained that "[s]ince the need to bridge the train tracks is the driving force behind this project," the south termini for the Project was established just beyond the bridge touchdown point. The north termini was established

as the STH 60/STH 164 intersection. *See* R.38, Ex.1003, A.R. at 00004. Citizens argues that the Ackerville Bridge Project is really just part of the road-widening plan being implemented by the County J/Highway 164 Project. However, as we noted above, we do not find that the record supports the contention that the defendants have been pretextually more concerned with road-widening than safety. Indeed, as constructed, the bridge meets the immediate safety concerns at this critical juncture of railroad and vehicular traffic. It would be compatible with the roadway expansion of the County J/Highway 164 Project only after modification. Furthermore, our review is not to determine whether the defendants made the best choice, but only whether they made a choice that was informed and reasonable. *See Save Barton Creek*, 950 F.2d at 1140.

The second factor, independent utility, is the most important factor in highway cases such as this. *See id.* ("In the context of a highway within a single metropolitan area, as the case at issue—as opposed to projects joining cities—courts have focused more on the factor of 'independent utility.' " (citations omitted)). With respect to this factor, the EA/FONSI pointed out that neither the bridge construction project, with its safety focus, or the County J/Highway 164 Project, with its expansion focus, require the construction of any other projects to be usable.

Finally, as to the third factor, restriction of alternatives, the Ackerville Bridge Project contemplates, rather than restricts, future roadway projects, including the possibility of a four-lane project if found to be needed. *See* R.38, Ex.1003, A.R. at 00004. Indeed, making space for future expansion was a "secondary purpose" for the Project in the first place.

In sum, the defendants analyzed the relevant factors set out in 23 C.F.R. § 771.111(f)(1)-(3), and came to a reasoned

conclusion. There is also no real evidence to support pretextual motive. Accordingly, we hold there was no improper segmentation in this case. *See Save Barton Creek*, 950 F.2d at 1139.

## Conclusion

For the foregoing reasons, we affirm the judgment of the district court.

AFFIRMED

Exhibit A

A true Copy:

Teste:

_____
*Clerk of the United States Court of
Appeals for the Seventh Circuit*